IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Number: 3:24CR122-RCY-1 |
| | ) |
| WILLIAM THOMAS MORTON, JR., | ) |
| Defendant. | ) |
| | ) |
| | ) |

## DEFENDANT'S MOTION TO DISMISS COUNTS TWO AND THIRTEEN UNDER THE SECOND AMENDMENT AND *BRUEN*

Counts 2 and 13 charge Mr. Morton with possession of a firearm by a person convicted of a crime punishable by a term of imprisonment of more than one year under 18 U.S.C. § 922(g). 18 U.S.C. § 922(g)(1) is unconstitutional on its face[1], and unconstitutional as applied to him.

### INTRODUCTION

On June 23, 2022, the Supreme Court issued its opinion in *New York State Rifle & Pistol Association, Inc., et al. v. Bruen*, 597 U.S.1 (2022). That decision upended Second Amendment doctrine, establishing a two-step analysis grounded only in constitutional "text and history." *Id.* at 2129. This test was applied for the first time in *United States v. Rahimi*, which addressed a facial challenge to the constitutionality of 18 U.S.C §922(g)(8). *United States v. Rahimi*, 602 U.S. ----, 144 S. Ct. 1889 (2024). The Supreme Court's decision in *Rahimi* does not dictate the

---

[1] As discussed further below, Mr. Morton maintains his facial challenge here only to preserve the issue for later review. *See United States v. Canada*, 103 F.4th 257, 258 (4th Cir. 2024) (denying facial challenge to § 922(g)(1)).

1

constitutionality, either facially or as applied to Mr. Morton, of 18 U.S.C. § 922(g)(1). It does, however, establish that the "plain text" of the Constitution applies to Mr. Morton's position as one of "the people" who has armed himself, rendering 18 U.S.C. § 922(g)(1) presumptively unconstitutional. *Rahimi* further illuminates the failure of the government, in other cases, to meet its burden of establishing a history and tradition of regulating conduct sufficiently similar to § 922(g)(1) to satisfy the second part of the *Bruen* test.

Criminalizing firearm possession pursuant to 18 U.S.C. § 922(g)(1) is unconstitutional under *Bruen*'s "text and history" standard. *Bruen*, 597 U.S. at 38-39. *Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. First, the Second Amendment's "plain text" entitles "the people" to the right to keep and bear arms, and nothing in that text or the Supreme Court's cases suggests felons are not among "the people." Mr. Morton, and others similarly situated, are part of "the people" who have the right to keep and bear arms.

Second, under *Bruen*'s "text and history" standard, the government is unable to rebut the presumption that § 922(g)(1) is unconstitutional. The United States' "historical tradition of firearm regulation" shows that felon-disarmament laws did not appear until the 20th century—well after the period *Bruen* deems relevant. And the government cannot discharge its burden by likening § 922(g)(1) to laws that disarmed supposedly "dangerous" or "unvirtuous" groups. Those categories are far too broad under a proper *Bruen* analysis, as confirmed by the Supreme Court in *Rahimi*. *Bruen* and *Rahimi* require that if a modern regulation such as § 922(g)(1) burdens a United States' citizen's constitutional right to arm themselves in self-defense, the government must prove a

2

history and tradition of regulating conduct that is distinctly similar to the modern regulation. *Bruen*, 597 U.S. at 29. The government cannot satisfy this burden because it can point to no historical regulation or statute that is distinctly similar to § 922(g)(1).

As further explained below, this Court must dismiss the indictment against Mr. Morton.

**RELEVANT FACTS**

The government has charged Mr. Morton in counts 2 and 13 with violations of § 922(g). Count 2 alleges possession of a privately manufactured 9mm pistol on April 1, 2024; Count 13 alleges a Hi-Point 9mm pistol on April 23, 2024.

Discovery so far indicates several potential bases for Mr. Morton's disqualifying conviction (which one is not specified in the indictment). There is a 1996 possession with intent to distribute (PWID) cocaine; a 1999 distribution of cocaine; a 2007 PWID cocaine, a 2011 grand larceny, a 2013 driving habitual offender, a 2018 simple possession of cocaine, and a 2019 distribution of a controlled substance. None of the convictions involve as an element (or suggest in the course of commission) any violence.

**I.   *Second Amendment law has evolved from* Heller*'s initial recognition of the right to bear arms to* Bruen*'s establishment of the "text and history" standard and the "how" and "why" metric clarified in* Rahimi.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that based on the text of the Second Amendment and history, the amendment "conferred an individual right" "to possess and carry weapons in case of confrontation." *Id.* at 576, 582, 592-95. Further, possessing ammunition—whether already loaded into a gun or available for reloading—is inherent in the right to bear arms. *See United States v. Miller*, 307 U.S. 174, 180-82

3

(1939) (describing and quoting militia laws in effect at the time Second Amendment passed requiring possession of ammunition).

In *Heller*, the Supreme Court only resolved the specific Second Amendment claim raised in that case. The Court did not definitively establish a test for evaluating other Second Amendment claims, define the broader contours of the fundamental Second Amendment right, or delimit the outer bounds of that right. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1050 (11th Cir. 2022) (Newsom, J., concurring) (recognizing that *Heller* left the lower courts "in an analytical vacuum;" citing *Silvester v. Becerra*, 138 S. Ct. 945, 947 (2018) (Thomas, J., dissenting from denial of certiorari) ("acknowledging that the Supreme Court 'has not definitively resolved the standard for evaluating Second Amendment claims'")).

It was only in *Bruen* that the Supreme Court set forth an actual "test" for deciding the constitutionality of all firearm regulations. *Bruen* clarified the "text and history" approach of *Heller* by newly bifurcating "text" and "history" into separate steps of an analysis to be used for deciding the constitutionality of all firearm regulations going forward. *Bruen*, 597 U.S. at 17.

At Step One of *Bruen*'s Second Amendment test, courts are to consider only whether "the Second Amendment's plain text covers an individual's conduct." *Id.* If it does, *Bruen* held, "the Constitution presumptively protects that conduct." *Id.* And, *Bruen* clarified, regulating presumptively protected conduct is unconstitutional unless the government, at Step Two of the analysis, can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation"—that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Id*. at 37.

*Bruen*, notably, not only clarified, but extended *Heller*'s reasoning, by newly articulating specific burdens and rules to govern the historical "tradition" inquiry. First, *Bruen* made clear that

the burden of proof at Step Two rests entirely with the government. The government alone must "establish the relevant tradition of regulation." *Id.* at 33-34, 58 n.25. If it does not, courts "are not obliged to sift the historical materials for evidence to sustain the [challenged] statute." *Id.* at 60. Rather, *Bruen* held, consistent with ordinary "principle[s] of party presentation," courts must "decide a case based on the historical record compiled by the parties." *Id.* at 25 n.6. If that record yields "uncertainties," the Court dictated, courts should rely on *Bruen*'s "default rules"—the presumption of unconstitutionality at Step One and the government's burden at Step Two—"to resolve [those] uncertainties" in favor of the view "more consistent with the Second Amendment's command." *Id.* In other words, and consistent with the rule of lenity, any possible tie on a Second Amendment challenge goes to the defendant.

Second, the absence of a historical regulation addressing the societal concern is important. If the challenged regulation addresses "a general societal problem that has persisted since the 18th century" the lack of a "distinctly similar" historical regulation is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. *Id*. at 26-27. However, if the challenged regulation addresses "unprecedented societal concerns or dramatic technological changes [this] may require a more nuanced approach," and the courts must look for a "relevantly similar" historical regulation to determine if the modern regulation is in violation of the Second Amendment. *Bruen*, 597 U.S. at 27-29. At the threshold, then, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether it existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 27-28. This is the "why" metric discussed in *Bruen* and *Rahimi*.

Third, the government's burden at Step Two of the *Bruen* analysis requires the government to show that the challenged regulation "is consistent with the Nation's historical tradition of

5

firearm regulation." *Id.* And a "tradition" of regulation requires more than one or two isolated examples. It requires a "widespread" historical practice "broadly prohibiting" the conduct in question. *Id.* at 36, 38. Although *Bruen* did not establish a clear threshold for determining when a historical practice rises to the level of a "tradition," it did hold that "a single law in a single State" is not enough, and expressed doubt that regulations of three of the thirteen colonies "could suffice." *Id.* at 35, 45-50, 65-66.

Fourth, the government's burden at Step Two of the *Bruen* analysis also requires the government to show that the challenged regulation "is consistent" with this country's historical tradition of gun regulation. The regulation must consistently proscribe the manner of gun possession as was done at the time of the founding. *See Rahimi*, 144 S. Ct. at 1898 ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding."). This equates to the "how" of the regulation as discussed in *Bruen* and *Rahimi*.

Fifth, *Bruen* underscored that courts must take careful account of the relevant time frame. Indeed, *Bruen* held, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 4. As recognized in *Heller*, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," which in the case of the Second Amendment was in 1791. *Id.* As a general rule, the longer a historical regulation pre- or post-dates this period, *Bruen* clarified, the less relevance it carries. *Id.* at 34-37. While historical practices "from the early days of the Republic" may be relevant in interpreting an "ambiguous constitutional provision" if the practice was "open, widespread, and unchallenged," *id.* at 35, *Bruen* held that the relevance of such practices quickly fades and ultimately vanishes as one approaches the mid- to late-19th century. *Id.* at 36-37. At most, *Bruen* clarified, practices from the

mid-late 19th century can provide "secondary" evidence to bolster or provide "confirmation" of a historical tradition that "had already been established." *Id*. at 37. But indisputably, by the time one gets to the 20th century, the relevance of historical evidence is all but nonexistent, so much so that the Court in *Bruen* declined to "address any of the 20th century historical evidence brought to bear by [the government] or their amici." *Id.* at 66 n.28. In short, to meet the *Bruen* Step Two inquiry, the historical tradition must be "longstanding," *id.* at 40, which means dating from 1791.

> II.   **Following Bruen*, prosecuting Mr. Morton for subsequently possessing firearms as a convicted felon violates the Second Amendment, both facially and as applied to Mr. Morton.*
>
>> a.   *The Second Amendment's plain text protects the right of "the people," such as Mr. Morton, to keep and bear arms.*

The Second Amendment protects the right of "the people" to keep and bear arms. Founding era dictionaries define "people" as "those who compose a community," and extending to "every person." *See, e.g.*, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) ("A nation; those who compose a community"), *available at* https://tinyurl.com/y95erjwf; Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) ("People" "signifies every person, or the whole collection of inhabitants in a nation or kingdom"), *available at* https://tinyurl.com/uk4b4fxd.

Although the Second Amendment's text does not circumscribe "the people" whose rights it guarantees, in other cases, the government has argued that "the people" are only "law-abiding, responsible" citizens. Thus, argues the government, those with prior convictions for offenses punishable by more than one year (including state law misdemeanors punishable by more than two years' imprisonment) are categorically outside the scope of those entitled to Second Amendment protections.

7

The Supreme Court, in *United States v. Rahimi*, rejected the Government's theory that Congress can disarm individual citizens because they are not "responsible." "'Responsible' is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law." *Rahimi*, 144 S. Ct. at 1903. Any government claim that the Second Amendment only applies to "responsible" citizens is void under *Rahimi*.

The phrase "law-abiding" is as vague as "responsible" in this framework. The *Rahimi* Court, in not embracing the government's position that only "law-abiding" citizens are part of the people, rejected that position as well. *See Rahimi*, 144 S. Ct. at 1944 (Thomas, J., dissenting) ("The Government, for its part, tries to rewrite the Second Amendment to salvage its case. It argues the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory."); *United States v. Coleman*, No. 3:22CR87 (DJN), ----F.Supp.3d ----, 2023 WL 6690935, at *6 (E.D. Va. Oct. 12, 2023) ("[T]he Government's reliance on the Supreme Court's various references to law-abiding persons as support for its contention that felons fall outside the scope of the Second Amendment does not persuade this Court. A phrase that malleable cannot be the peg that the Court references to determine who falls within or beyond the protections guaranteed by the Constitution.").

The *Rahimi* Court accepted that Zackey Rahimi was "of the people" as contemplated by the Second Amendment, without discussion. *Rahimi*, 144 S. Ct. at 1987 (stating that "when the government regulates arms-bearing, as when the government regulates other constitutional rights, it bears the burden to 'justify its regulation.'") (quoting *Bruen*, 597 U.S. at 24). The *Rahimi* Court made clear this language of "responsible" did not originate from the Court's case law. *Rahimi*, 144 S. Ct. at 1903. The *Rahimi* majority highlighted that *Heller*'s use of the word "responsible" simply spoke an easy truth for citizens who unquestionably were covered under "the people" of the Second

Amendment, it did not define "the people" in its totality. *Id.* In short, the "law-abiding, responsible citizen" theory unanimously rejected by the Supreme Court in *Rahimi* "is the Government's own creation, designed to justify every one of its existing regulations." *Id.* at 1945 (Thomas, J., dissenting). "It has no doctrinal or constitutional mooring." *Id.* To the contrary, *Rahimi* confirms that the Supreme Court meant what it said when it declared that the Second Amendment right "belongs to all Americans." *Heller*, 554 U.S. at 581.

The Second Amendment text must be accorded its plain meaning—the same meaning it carries in other parts of the Bill of Rights—and "unambiguously" refers to all members of the national community. Thus, because 18 U.S.C. § 922(g)(1) regulates conduct the Second Amendment protects, section 922(g)(1)'s prohibition on felons possessing guns is presumptively unconstitutional under *Bruen*'s plain text standard. *See e.g.*, *Rahimi*, 144 S. Ct. at 1907 (Gorsuch, J., concurrence) ("In this case, no one questions that the law Mr. Rahimi challenges addresses individual conduct covered by the text of the Second Amendment.").

> b. *Bruen's historical test requires that the government show a robust tradition of "distinctly similar" historical precursors and teaches that exceptions to "the Second Amendment's 'unqualified command'" must be narrowly drawn.*

To rebut the presumption of unconstitutionality, the government must demonstrate that 18 U.S.C. § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 84. Crucially, the nature of that burden varies depending on what kind of problem a statute is designed to address—specifically, whether the problem is old or new. In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry is "fairly straightforward." *Id.* at 26-27. The government must identify a robust tradition of "distinctly similar" founding-era regulations. *Id.* If "the Founders themselves could have adopted" a particular regulation "to confront [a

9

longstanding] problem," but did not do so, that is evidence the statute is unconstitutional today. *Id.* So, too, if some jurisdictions in the founding era attempted to enact analogous regulations but those proposals were rejected on constitutional grounds. *Id.* Both *Heller* and *Bruen* fell in this category: the laws challenged in those cases were aimed at a problem—"handgun violence, primarily in urban areas"—that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Id.*

A "more nuanced approach" applies to regulations "implicating unprecedented societal concerns or dramatic technological changes" or addressing a problem that was "unimaginable at the founding." *Id*. at 27. For the latter regulations, courts ask whether the modern regulation is "relevantly similar" to a historical analogue. *Id*. at 28-29 ("whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry").

Felons' access to firearms, at which § 922(g)(1) is directed, has posed a (potential) problem since well before 1791. Section 922(g)(1) is designed to address a general societal problem that has existed since the 18th century: the concern of allowing certain categories of individuals convicted in the past of criminal conduct to continue to arm themselves in self-defense. Because this is not an "unprecedented societal concern," or "dramatic technological change" the government must provide a distinctly similar historical regulation to show that § 922(g)(1) does not violate the Second Amendment. The government has been unable in other cases to prove such a historical tradition.

Even if this Court were to consider the "relevantly similar" standard as applicable to the historical review required by the second step in *Bruen*, the government cannot provide relevantly

similar regulations to § 922(g)(1). The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [*i.e.*, the 'how'] and whether that burden is comparably justified [*i.e.*, the 'why']." *Id.* at 29. *Rahimi* and *Bruen* helped further define the similarity analysis, noting that the regulation must be similar both in the "how" and the "why". *See Rahimi*, 144 S. Ct. at 1898 ("Why and how the regulation burdens the right are central to this inquiry."); *Bruen*, 597 U.S. at 29 ("When considering whether a modern regulation is consistent with historical regulations and thus overcomes the presumption against firearms restrictions, our precedents 'point toward at least two metrics [of comparison]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.'").

This "how" and "why" must come from the same historical tradition of regulation to provide constitutional support to the challenged regulation, otherwise the government would be provided a "blank regulatory check" to implicate Second Amendment rights. *Id.*, (Thomas, J., dissenting) (internal quotation marks omitted). *Rahimi* is an example of this analysis, considering a modern-day societal concern—domestic violence, and the regulations temporarily restricting access to firearms for domestic abusers, in reviewing the historical analogue.

In *Rahimi*, the "how" was a *temporary* restriction on Mr. Rahimi's Second Amendment right to arm himself in self-defense. *Rahimi*, 144 S. Ct. at 1902. The "why" was because he had been determined to be a "credible threat to the physical safety of others." *Rahimi*, 144 S. Ct. at 1896. The *Rahimi* Court connected this "how and why" to a historical tradition of "regulations targeting individuals who physically threatened others . . . ." *Rahimi*, 144 S. Ct. at 1899. The *Rahimi* Court applied the "relevantly similar*"* standard to the challenged regulation. The Court's application of the "relevantly similar" standard aligns with the *Bruen* framework because

11

protecting intimate partners from domestic violence is unfortunately only a modern-day societal issue.

Legal consequences, including impacts on citizens' rights to arm themselves, for those who committed domestic abuse and targeted violence towards domestic partners was not something generally accepted as a societal concern at the time the Second Amendment was ratified. *See* Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn. St. L. Rev. 337, 346 (2015) (noting that the primary penalty for many domestic abusers was a fine or the stocks in the 17th century). In fact, common law recognized a "right of chastisement" that permitted husbands to physically punish their wives. *See* Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2121-41 (1996). And, protective orders are an inherently modern approach to addressing the now accepted societal concern of domestic violence. *See* Melvin Huang, *Keeping Stalkers at Bay in Texas*, 15 Tex. J. on C.L. & C.R. 53, 68 (Fall 2009) ("[P]rotective orders first came into existence in 1970 when the District of Columbia passed its Intrafamily Offenses Act. . . . Pennsylvania became the first state to authorize orders when it passed its Protection from Abuse Act in 1976.").

*Rahimi* was a narrow holding, declining only to uphold the statute in light of the facial challenge brought. 144 S. Ct. at 1903 ("In *Heller*, *McDonald*, and *Bruen*, this Court did not 'undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment.' Nor do we do so today. Rather, we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment") (internal citation omitted). However, if anything, *Rahimi's* reliance on and analysis of the historical surety laws and "going armed laws" highlight the lack of historical support for a

more permanent, broader ban of Second Amendment rights to a category of people such as Mr. Morton.

Importantly, the "how" in § 922(g)(1) is a generally permanent infringement on a citizen's Second Amendment right to arm themselves in self-defense. The "why" is a perceived issue with a class of citizens, based on status, not based on a specific finding of dangerousness, or threats to others. *See Rahimi*, 144 S. Ct. at 1898 ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding."); *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring) ("To be sure, a court must be careful not to read a principle at such a high level of generality that it waters down the right."). This broad prohibition of a class of people's Second Amendment right to carry arms for self-defense is a far-cry from the specific regulation upheld in *Rahimi*, or discussed in *Bruen*. *Cf. Rahimi*, 144 S. Ct. at 1938, n.5 (Thomas, J., dissenting) (citing *Bruen*, 597 U.S. at 70 (noting that regulations "limit[ing] the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could carry arms" do not justify "broadly prohibit[ing] the public carry of commonly used firearms for personal defense.")). Even considering the more nuanced "relevantly similar" standard metrics, the government cannot meet its burden to establish a historical analogue to §922(g)(1).

Because the principle societal concern underlying § 922(g)(1) is not a uniquely modern one, Mr. Morton's position is that to pass the second part of the *Bruen* test, the government must propose a "distinctly similar" regulation that either substantially abridged felons' right to keep and bear arms, or permanently denied firearms to some group akin to felons. No such laws from the founding era exist. *See, e.g.*, Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex. Rev. L. & Pol. 245, 291 (2021)

13

(noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at the founding); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) (same); *see also Binderup v. Att'y General*, 836 F.3d 336, 360 (3d Cir. 2016) (Hardiman, J., concurring) (dating felon dispossession statutes to 1931 and 1961); *Folajtar v. Att'y General*, 980 F.3d 897, 914-15 (Bibas, J., dissenting) (concluding no founding era case or statute imposed a "near-blanket ban for all felons"); *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). And the government has yet to identify a single historical regulation, let alone a robust history and tradition, that broadly prohibited the ability to arm oneself in self-defense to such categories of people.

The first felon-in-possession laws similar to § 922(g)(1) did not appear until the 20th century. What is today's § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from "receiving" firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm "receipt" by those convicted of crimes such as murder, rape, and kidnapping. *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until 1961 that Congress amended that statute to prohibit "receipt" "by all felons." *Skoien*, 614 F.3d at 640 (citing Pub. L. 87-342, 75 Stat. 757) (noting that under the statute, "possession" was evidence of "receipt"). And it was not until 1968 that Congress formally "changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* Thus, the first firearm regulation in America broadly prohibiting all felons from possessing firearms was not enacted until almost two centuries after our nation's founding, when the modern version of § 922(g)(1) became law. *See Kanter*, 919 F.3d at 464 n.12 (Barrett, J., dissenting) ("[T]he first general prohibition on felon gun possession was

14

not enacted until 1961 . . . ."); *id.* at 462 ("[S]cholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms . . . .").

Section 922(g)(1) is the first law in our Nation's history to broadly prohibit all felons from possessing a firearm. There was nothing before the 20th century, even in individual colonies or states. *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009) ("state laws prohibiting felons from possessing firearms or denying firearm licenses to felons date from the early part of the twentieth century"). As *Bruen* makes clear, such "belated innovations . . . come too late to provide insight into the meaning of the Constitution in [1791]." *Bruen*, 597 U.S. at 36-37 (citing with approval the Chief Justice's dissent in *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 312 (2008)); *see also id.* at 2154 n.28 (declining to "address any of the 20th century historical evidence brought to bear by [the government] or their amici").

In sum, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). The "Founders themselves could have adopted laws like § 922(g)(1) to "confront" the "perceived societal problem" of violence posed by felons possessing firearms. *Bruen*, 142 S. Ct. at 2131. But they declined to do so, and that inaction shows that § 922(g)(1) "[i]s unconstitutional." *Id.*

History indicates that the opposite of § 922(g)(1) was enshrined in the Second Amendment. As noted by the *Heller* Court, and Justice Thomas dissenting in *Rahimi*, "[T]he Stuart Kings Charles II and James II succeed in using select militias loyal to them to suppress political dissidents in part by disarming their opponents." *Heller*, 554 U.S. at 592; *Rahimi*, 144 S. Ct. at 1934 (Thomas, J., dissenting). As a result, the founders were extremely aware and protective of individual liberty and the right to bear arms. As Justice Thomas further notes in his dissent, "laws targeting

15

'dangerous' persons led to the Second Amendment. It would be passing strange to permit the Government to resurrect those self-same 'dangerous' person laws to chip away at that Amendment's guarantee." *Rahimi*, 144 S. Ct. at 1934 (Thomas, J., dissenting).

Finally, and quite importantly, felons were not only permitted to possess firearms at the time of the founding due to the absence of any laws specifically prohibiting them from doing so; felons were affirmatively required to possess firearms as members of the militia. Notably, in *Heller*, the Supreme Court recognized that "the Second Amendment's prefatory clause"—*i.e.*, "A well regulated Militia, being necessary to the security of a free State"—"announce[d] the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. Given that preventing elimination of the militia was the purpose of the Second Amendment, the Second Amendment's protections would at least have extended to those who would have been in the militia at the time of the founding. And historical evidence from that period, which is the most relevant period per *Bruen*, confirms that this group most definitely included felons.

*Heller* specifically defined the term "militia" in the Second Amendment's prefatory clause to mean "all males physically capable of acting in concert for the common defense." 554 U.S. at 595. Indeed, statutory law from the founding era demonstrates that "all males" required to serve in the militia encompassed felons. Specifically, in the first Militia Act enacted one year after the Second Amendment's ratification, Congress was clear that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years . . . shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271 (*see* Ex. B attached). The Act of 1792 further stipulated that "every citizen so enrolled . . . shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and various other firearm

16

accoutrements, including ammunition. *Id.* Although the Act "exempted" many classes of people from these requirements (e.g., "all custom-house officers," "all ferrymen employed at any ferry on the post road"), felons notably were not among those exempted. *Id.* § 2, § 1 Stat. 272.

In fact, at least eight state militia statutes, passed shortly before or after 1791, contained similar requirements. Specifically, these early state militia statutes similarly did not exempt felons:

- Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700-1809);

- Wright and Potter, 7 Acts and Laws of the Commonwealth of Massachusetts, 1780-1805, ch. 14, at 381-82, 389-90 (1898);

- Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227-28, 232-33 (1792);

- Marbury, Digest of Laws of the State of Georgia, Act of December 24, 1792, §§ 9-10, at 350 (1802);

- Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251-52, 256 (1805);

- Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134-36 (1797);

- Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20, at 367-70 (1799); and

- Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808).

*See* Ex. A.

The fact that Founding era militia statutes did not exclude felons, and did require all militia members to possess firearms, confirms that the government cannot meet its heavy burden at the second step of *Bruen*'s test to show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." At the most relevant time period under *Bruen*, namely, the time period immediately preceding and post-dating adoption of the Second Amendment, *see Bruen*, 597 U.S. at 34 ("Constitutional rights are enshrined with the scope they were understood to have when

17

the people adopted them"), all white, able-bodied men—regardless of any status as a felon—between the ages of 18-45 were required to serve in both the national and many state militias. And because of their militia obligation, these men—regardless of any status as a felon—were required to possess firearms.

The above arguments apply equally to the facial and as applied challenges Mr. Morton raises herein. The Fourth Circuit has held that because there are "*some* set of circumstances" where § 922(g)(1) may be constitutionally applied, a facial constitutional fails. *United States v. Canada*, 103 F.4th 257 (4th Cir. 2024). *Canada* was decided before the Supreme Court's application and further elucidation of the *Bruen* standard in *Rahimi*. In *Canada*, the Fourth Circuit noted it would not need to choose an "analytical path" to considering the facial constitutional challenge to § 922(g)(1) and broadly asserted that a set of circumstances existed in which § 922(g)(1) would be constitutional. *Canada*, 103 F.4th at 257. The *Canada* court observed that "[t]he law of the Second Amendment is in flux, and courts (including this one) are grappling with many difficult questions in the wake" of *Bruen*. *Canada*, 103 F.4th at 257.

As set forth above, *Rahimi*'s further clarification of the "text and history" test established in *Bruen* should prompt the Fourth Circuit to reconsider its analysis of a facial challenge to § 922(g)(1). This position is consistent with the United Stated Supreme Court's actions on numerous pending § 922(g)(1) certiorari petitions affected by the decision in *Rahimi*. The Supreme Court, after *Rahimi,* issued a number of orders granting petitions for writs of certiorari on constitutional challenges under *Bruen*, vacating the judgments, and remanding the cases back to lower courts for review in light of the Court's decision in *Rahimi*. Importantly, the decision in *United States v. Doss,* No. 22-3662, 2023 WL 8299064 (8th Cir. 2023), which was one of the pending certiorari petitions granted, the judgment vacated, and the case remanded, included a facial and as-applied

18

challenge to § 922(g)(1). The Supreme Court deems *Rahimi* significant enough to have lower courts review their judgments for both facial and as-applied challenges to federal firearm regulations. As such, the Fourth Circuit's decision in *Canada* should be reconsidered post-*Rahimi*.

Thus, for all of the foregoing reasons, 18 U.S.C. § 922(g)(1) is facially unconstitutional.

    *c.  Additionally, as applied to Mr. Morton, § 922(g)(1) is unconstitutional.*

Applying the foregoing analyses to the facts of this case, § 922(g)(1) is also unconstitutional as applied to Mr. Morton. Mr. Morton was born and raised in Virginia. He is a lifelong citizen of the United States. He is thus one of "the people" that the Second Amendment demands must be allowed to bear arms and carry necessary ammunition to make a gun operable. The plain text of the Second Amendment presumptively protects his alleged conduct in possessing the firearms found in this case.

Mr. Morton is prohibited from possessing guns because of his status as a convicted felon, specifically his prior convictions for drugs, theft, and driving violations. Unlike Zackey Rahimi, Mr. Morton was never found to be a credible danger to a specific individual or victim, or other people generally. He was not previously convicted of a "violent offense" as defined in federal code, or even as considered more broadly by historical societal concerns. Further, Mr. Morton's Second Amendment rights have been, for all practical purposes, permanently revoked because of his felon status. Unlike *Rahimi*, § 922(g)(1) is not a temporary restriction, but a permanent infringement, more similar to the ongoing regulations considered in *Heller* and *Bruen*. Both the "how" and the "why" in Mr. Morton's case are without historical analogue. The surety laws and going-armed statutes discussed in *Bruen* and *Rahimi* had limitations regarding their application to people who were found to pose a risk of violence and they were temporary restrictions on a citizen's right to arm themselves. *Bruen*, 597 U.S. at 5; *Rahimi*, 144 S. Ct. at 1898-1901. Neither

of these circumstances apply to Mr. Morton's Second Amendment rights being permanently revoked with no finding that he is a credible threat to others.

Because the government will be unable to show that § 922(g)(1) as applied to Mr. Morton is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, the Court must dismiss Counts Four and Five.

## CONCLUSION

As set forth above, the Court should dismiss Counts Two and Thirteen of the indictment in this case as Mr. Morton's prosecution under both of those counts of the indictment violates his Second Amendment right to keep and bear arms.

Respectfully Submitted,
William Thomas Morton, Jr..

By: _____/s/_____
Counsel
Joseph S. Camden
Va. Bar No. 92143
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0830
Fax (804) 648-5033
joseph_camden@fd.org