IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.

WILLIAM THOMAS MORTON, JR.,

                  Defendant.

Case No. 3:24-cr-122-RCY

## THE GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS TWO AND THIRTEEN

William Thomas Morton, Jr., (hereinafter "the Defendant"), is charged in a multi-count indictment, which includes counts two and thirteen, alleging that he possessed firearms after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).  ECF No. 1.  He now moves this Court to dismiss counts two and thirteen of the indictment and hold that under *New York State Rifle & Pistol Assn. v. Bruen*, 142 S. Ct. 2111 (2022) and *United States v. Rahimi*, 144 S. Ct. 1889 (2024), § 922(g)(1) is unconstitutional on its face and as applied to him.  ECF No. 42.  The Defendant's motion should be denied.

The Defendant's motion runs afoul of this Court's opinions in *United States v. Lane*, 689 F. Supp. 3d 232 (E.D. Va. Aug. 31, 2023), *United States v. Pemberton*, 2024 WL 3166893 (E.D. Va. June 25, 2024), and of the large majority of other courts to have addressed this issue, to include the Fourth Circuit's recent decision in *United States v. Canada*, ---F.4th ---, 2024 WL 2807182, at *1 (4th Cir. 2024) rejecting the argument that § 922(g)(1) is facially unconstitutional.  Accordingly, § 922(g)(1) is constitutional and this Court should deny the Defendant's motion.

**Background**

In the spring of 2024, special agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), in Richmond, Virginia, utilized two confidential informants ("CIs") to purchase narcotics and firearms from individuals in the City of Richmond. Their goal was to address rising violent crime, stemming from firearms and narcotics trafficking in the most violent areas of the city. The CIs were paid by ATF agents to make controlled buys of narcotics and firearms between March and August, 2024.

In April, 2024, one of the CIs was introduced to the Defendant by the Defendant's girlfriend. On April 1, 2024, the Defendant possessed and sold the CI a privately made firearm ("PMF"), 9mm pistol. On April 23, 2024, the Defendant possessed and sold the CI a loaded Hi-Point Firearm, Model C9, 9mm caliber pistol, bearing serial number P1345735. Prior to the transactions, the Defendant had been convicted of multiple felony offenses, to include Possession of Cocaine with the Intent to Distribute (City of Richmond, 1996), Distribution of Cocaine (County of Henrico, 1999), Possession of Cocaine with the Intent to Distribute (City of Richmond, 2007), Grand Larceny (City of Richmond, 2011), Possession of a Schedule I/II Controlled Substance (City of Richmond, 2018), and Manufacture/Distribute a Schedule I/II Controlled Substance, Second Offense (City of Richmond, 2019). While on state probation, the Defendant signed a form acknowledging that was a convicted felon, and that he knew he was not supposed to purchase, carry, own, or transport firearms or ammunition.

**Legal Framework**

*Bruen* did not invalidate the Supreme Court's holding in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that § 922(g)(1) is presumptively constitutional, and this Court is still bound by *Heller*. In *Heller*, the Supreme Court listed various "presumptively lawful"

regulations, which included "prohibitions on the possession of firearms by felons." *Id.* at 626–27, & n.26. The Supreme Court in *Bruen*—while clarifying the standard by which to assess constitutional challenges under the Second Amendment—reiterated its prior declaration in *Heller* that such prohibitions remain presumptively valid. *See Bruen*, 142 S. Ct. at 2157, 2162. Most recently, in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court reaffirmed that *Heller* established "that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26). Accordingly, this Court is still bound by *Heller*'s holding that prohibitions on felons possessing firearms are presumptively valid.

**I.      In *Heller*, the Supreme Court recognized the right of "law-abiding" citizens to bear arms.**

Ever since the Supreme Court engaged in its first "in-depth examination of the Second Amendment," it noted that the Amendment is subject to important limitations. *Id.* at 635. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court assessed a District of Columbia law requiring residents to keep lawfully owned firearms unloaded and disassembled in their homes. 554 U.S. at 575. The Court held that the law violated the Second Amendment, which protects the right of "law-abiding" citizens to keep firearms in their homes for self-defense. *Id.* at 635.

In striking down the law, the Supreme Court established a constitutional floor that the government may not disarm law-abiding citizens in their homes. But it noted that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. To the contrary, the Court emphasized: "[N]othing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the

3

possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27, & n.26. The Court added that while the government may not prohibit handguns "held and used for self-defense in the home," the legislature retains a "variety of tools" for regulating handguns. *Id.* at 636.

## II.     *Bruen* confirmed Heller's ruling on § 922(g)(1)'s presumptive validity.

*Bruen* neither overruled *Heller* nor invalidated *Heller*'s statement regarding § 922(g)(1)'s presumptive validity. In *Bruen*, the Supreme Court extended *Heller* to hold that the Second Amendment also "protect[s] an individual's right to carry a handgun for self-defense outside the home." 142 S. Ct. at 2122. *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home, finding that the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156.

In striking down the law, *Bruen* rejected the "two-step" framework adopted by most courts of appeals after *Heller*. *See id.* at 2126–27. *Bruen* then stated the "standard for applying the Second Amendment." *Id.* at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129–30. Second, when a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

In articulating this standard, *Bruen* did not overrule any of *Heller*'s holdings. Quite the opposite. *Bruen* repeatedly relied on *Heller*'s statements regarding the limits of the Second Amendment and the presumptive lawfulness of "longstanding prohibitions" on firearms

possession. *Id.* at 2118, 2128, 2133, 2134. In fact, Justice Alito noted that *Bruen* does not

"disturb[ ] anything that [the Court] said in *Heller* . . . about restrictions that may be imposed on

the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring). And Justice Kavanaugh,

joined by Chief Justice Roberts, emphasized that "the Second Amendment allows a 'variety' of

gun regulations," and he reiterated *Heller's* assurances about not "cast[ing] doubt on

longstanding prohibitions on the possession of firearms by felons." *Id.* at 2162 (Kavanaugh, J.

and Roberts, C.J., concurring).

     *Heller*'s and *Bruen*'s statements that the Second Amendment is limited to "law-abiding

citizens" were "no stray remark or aside" and instead help "explain the Court's rationale and thus

[are] part of the holding[s]" of those cases. *United States v. Bloom*, 149 F.3d 649, 653 (7th Cir.

1998), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010). But even if

characterized as dicta, Supreme Court dicta controls when it is on point and not contradicted by

subsequent statements. *See, e.g.*, *United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002)

(applying dicta and citing *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) (stating that

circuit court "is bound by Supreme Court dicta almost as firmly as by the Court's outright

holdings, particularly when the dicta is recent and not enfeebled by later statements.").

## II.    This Court is further bound by the Fourth Circuit's ruling in *Moore*, which upheld § 922(g)(1) under *Heller* without applying means-end scrutiny.

     In addition to *Heller*, this Court remains bound by Fourth Circuit precedent that has

upheld the constitutionality of § 922(g)(1).  In *United States v. Moore*, 666 F.3d 313, 318 (4th

Cir. 2012), the Fourth Circuit held § 922(g)(1) was presumptively lawful under *Heller*. The

Fourth Circuit had "no difficulty" concluding that § 922(g)(1) was constitutionally valid on its

face, "since clearly there are cases where felon firearm possession is constitutionally limited." *Id.*

at 319. Notably, the Court in *Moore* did not apply means-end scrutiny to reach its result. *Id.* at

318. The Court also rejected Moore's as-applied challenge. The Court explained, "However the Supreme Court may come to define a 'law-abiding responsible citizen' for Second Amendment purposes, Moore surely would not fall within that group," noting that Moore's prior convictions for robbery and assault with a deadly weapon "clearly demonstrate that he is far from a law-abiding responsible citizen." *Id.* at 319–20.

In *United States v. Pruess*, 703 F.3d 242, 244 (4th Cir. 2012), the Fourth Circuit took up a similar challenge to the constitutionality of § 922(g)(1) brought by an assertedly non-violent felon.  Like the defendant in *Moore*, however, the defendant in *Pruess* could not "rebut the presumption of lawfulness of the felon-in-possession prohibition as applied to him." *Id.* at 246.[1]

Unless and until *Moore* and *Pruess* are overruled, either by the Supreme Court or the Fourth Circuit sitting en banc, they bind this Court. *See United States v. Collins*, 401 F.3d 212, 219 (4th Cir. 2005) ("A decision of a panel of this court becomes the law of the circuit and is binding . . . unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court." (quoting *Etheridge, v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090 (4th Cir. 1993))). Plainly, no decision has purported to expressly overrule *Moore* and *Pruess*.

Nor did *Bruen* "clearly undermine[]," *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998), or "specifically reject[]," *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011),

---

[1] Because the presumption of constitutionality from *Heller* and *Moore* governed, the Fourth Circuit in *Pruess* determined there was no need to analyze the historical scope of the Second Amendment right. 703 F.3d at 247 n.3. The Court observed, however, that the defendant erred "in suggesting that historical sources weigh in his favor." *Id.* On the contrary, there is "substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'" *Id.* The Court went on to note that "our sister circuits have consistently upheld applications of § 922(g)(1) even to non-violent felons." *Id.* at 247.

the reasoning on which those precedents were based. Not only did the Supreme Court reaffirm *Heller* in *Bruen*, thereby effectively reaffirming *Moore* and *Pruess*, but eight members of the *Bruen* Court—six in *Bruen* itself—have made clear that statutes like § 922(g)(1) are constitutional and supported by history. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations, "including 'longstanding prohibitions on the possession of firearms by felons[.]'" (quoting *Heller*, 554 U.S. at 626)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of Heller's holding [permitting felons to be prohibited from possessing firearms].").

That is not all. Two years earlier, Justice Thomas—who authored the majority opinion in *Bruen*—and Justice Gorsuch recognized that "history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals." *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540–41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting). In short, eight of the nine members of the *Bruen* Court have explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010).

Moreover, nothing in *Bruen* undercuts *Moore* and *Pruess*. *Bruen*, as mentioned above, was concerned with the viability of the two-step "means-end scrutiny" test. 142 S. Ct. at 2125–27. But critically, the Fourth Circuit did not employ means-end scrutiny in *Moore* or *Pruess*; instead, it applied *Heller* to uphold the constitutionality of § 922(g)(1). And as the Supreme

7

Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* were supported by history. *See Bruen*, 142 S. Ct. at 2128 (explaining that in *Heller*, the Court "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right"); *Heller*, 554 U.S. at 626, 635 (acknowledging that permissible regulations, including the "longstanding prohibitions on the possession of firearms by felons," were supported by "historical analysis" and "historical justifications"). Thus, by following *Heller*, the Fourth Circuit necessarily upheld § 922(g)(1) because such a regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

## *Bruen* Analysis

### I.      The Second Amendment does not cover the Defendant's conduct.

The Second Amendment protects "the people." U.S. Const. amend. II. In interpreting the Second Amendment's text and history, the Supreme Court has held that the Amendment's scope is limited to the community of law-abiding citizens. As a convicted felon, the Defendant cannot meet his burden to show the Amendment grants *him* a right to keep and bear arms.

In *Bruen*'s two-part test for assessing Second Amendment challenges, the Court only burdens the government with justifying its regulations after it is established that challenged conduct falls within the Second Amendment's scope. *See Bruen*, 142 S. Ct. at 2129–30. Accordingly, where—as here—the person falls outside the scope of the Second Amendment, the government does not bear the burden of presenting a historical tradition to support its regulation.

### A.      The Supreme Court has interpreted the Second Amendment's text as protecting an individual right retained by law-abiding persons.

"The people" whose rights the Second Amendment protects are law abiding members of the American polity, not felons. *Heller*, 554 U.S. at 635. After completing a thorough historical

analysis—the Court articulated that the exact interest protected by the Second Amendment's text was: "the right of *law-abiding*, *responsible* citizens to use arms in defense of hearth and home." *Id*. at 635 (emphasis added); *see also id*. at 644 (Stevens J., joined by Souter, Ginsburg, and Breyer, J.J., dissenting) (explaining how the *Heller* majority "limits the protected class" in multiple ways).

In *Bruen*, the Supreme Court confirmed—explicitly and repeatedly—that the right to keep and bear arms belongs only to ordinary, law-abiding citizens. *See Bruen*, 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an *ordinary, law-abiding* citizen to possess a handgun in the home for self-defense" (emphasis added)); *id*. at 2131 (quoting *Heller's* statement that the Second Amendment protects "'the right of *law-abiding, responsible* citizens to use arms' for self-defense" (emphasis added)); *id*. at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a *law-abiding citizen's* right to armed self-defense" (emphasis added)); *id*. at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents *law-abiding* citizens with ordinary self-defense needs from exercising their right to keep and bear arms" (emphasis added)). In fact, *Bruen* and its concurring opinions define the Second Amendment as applying to "law-abiding citizens" at least twenty-one times. *See id.* at 2122, 2125, 2133, 2134, 2138, 2150, 2156, 2157, 2158, 2159, 2161.

Notably, the reason *Bruen* holds that "shall issue" licensing schemes are presumptively reasonable is the Court's determination that permissible licensing schemes will "often require applicants to undergo a background check . . . designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding and responsible citizens." *Id.* at 2138 n.9 (emphasis added); *see also id.* at 2162 (Kavanaugh, J., concurring) ("[R]egimes [that] may require a license

applicant to undergo fingerprinting, a background check, a mental health records check, and training . . . are constitutionally permissible."). This reasoning underscores that § 922(g)(1)—which also aims to ensure that "those bearing arms" are "law-abiding" citizens—accords with the Second Amendment.

**B.      The Second Amendment's history confirms the Supreme Court's interpretation of its text.**

Legal scholarship confirms that felons were not part of the political community protected by the Second Amendment. *See* Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is a civic right [that] . . . was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms."); John Trenchard & Walter Moyle, *An Argument Shewing, That a Standing Army is Inconsistent with a Free Government, and Absolutely Destructive to the Constitution of the English Monarchy* 7 (1697) (noting that the "virtuous citizen concept was ingrained in republicanism, such that its proponents emphasized that a firearm should not be "log'd in the hand of any who had not an Interest in preserving the publick Peace").

Indeed, according to Thomas Cooley's 1868 *Treatise on Constitutional Limitations*, which the *Heller* Court treated as a highly persuasive treatise written by "[t]he most famous" late-nineteenth-century legal scholar, 554 U.S. at 616, certain classes of people were "almost universally excluded" from exercising core civic rights, including "the idiot, the lunatic, and the

felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).

In 18th century England, one "arousing 'suspicion of an intention to commit any act of violence or disturbance of the peace'" was often prohibited from possessing a firearm. C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 716 (2009). Colonial Americans then continued the English tradition of disarming those "perceived as dangerous." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arm*, 20 Wyo. L. Rev. 249, 262 (2020). "Like English laws, colonial laws were sometimes discriminatory and overbroad—but even those were intended to prevent danger." *Id.* Regulations that prevent dangerous individuals from acquiring or owning firearms align with how "the founders thought the legislature should decide which groups pose a threat to the social order or the community." Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1586 (2022).

### C. Excluding felons from gun rights is analogous to inherent limitations on other constitutional rights.

Constitutional rights commonly carry inherent limitations. *See e.g.*, *Robertson v. Baldwin*, 165 U.S. 275, 287–88 (1897) (Thirteenth Amendment, outlawing slavery and "involuntary servitude" generally, was always understood to contain an exception for seamen having signed a contract to sail). Indeed, other individual rights recognized in the Bill of Rights are unavailable to certain groups, including incarcerated persons. *See, e.g.*, *Hudson v. Palmer*, 468 U.S. 517, 526 (1984); *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). Incarcerated persons and felons are overlapping groups. Membership in both groups is earned by conduct rather than being based on immutable traits. Just like incarceration, felon status may be permanent or temporary. *See* 18 U.S.C. § 921(a)(2) (excluding from § 922(g)(1) "[a]ny conviction which has

been expunged, or set aside or for which a person has been pardoned or has had civil rights restored . . ."); *United States v. Kahoe*, 134 F.3d 1230, 1233–34 (4th Cir. 1998) ("The plain language of § 921(a)(20) means that a conviction that has been set aside can no longer be disabling. The language does not provide that such a conviction was not disabling between the time it was obtained and the time it was set aside.")

Most importantly, the core justification for denying certain Constitutional rights to felons and to incarcerated persons is the same core justification underlying the Second Amendment: safety, both personal and public. *Compare Wolfish*, 441 U.S. at 547 ("[E]ven when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in light of the central objective of prison administration, safeguarding institutional security.") *with Bruen*, 142 S. Ct. at 2131 ("The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all interests the right of law-abiding, responsible citizens to use arms' for self-defense." (quoting *Heller*, 554 U.S. at 635).

Felons historically were excluded from "exercis[ing] the elective franchise," *id*. at 29, as well as from other, closely related "political rights," including the rights to "hold public office," to "serve on juries," and, most relevant here, "to bear arms," *see* Akhil Reed Amar, *The Bill of Rights* 48 (1998). If convicted felons can be excluded from "the people" with the power to vote under Article I, Section 2 of the Constitution, "it would also be constitutional then to exclude those [persons] from the Second Amendment's kindred 'political right.'" *Collette*, 2022 WL 4476790, at *6; *see also id.* at *7 ("[T]his Nation has a historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and powers of 'the

12

people'"). Because the Defendant is excluded from the class of law-abiding citizens whose rights the Second Amendment protects, he cannot satisfy the first part of *Bruen*'s test.

### D. *Rahimi* has no effect on this Court's prior conclusion in *Lane* that § 922(g)(1) is presumptively valid.

Like hundreds of other courts, this Court has already considered and rejected the Defendant's arguments.  In *United States v. Pemberton,* this Court held that although *Rahimi* "took issue with the 'vague' nature of the term 'responsible'" and "has, on occasion, used the terms 'law-abiding' and 'responsible' together when discussing those who enjoy the Second Amendment right," "the Supreme Court has also used the 'law-abiding citizen' limitation by itself." No. 4:24-cr-35, 2024 WL 3166893, at *2 (E.D. Va. June 25, 2024) (citing *Bruen*, 597 U.S. at 71). As this Court explained, in reaffirming its earlier, pre-*Rahimi* decision upholding the constitutionality of § 922(g)(1), *see Lane*, 689 F. Supp. 3d 232, "this [c]ourt's decision in *Lane* expressly rested upon *Heller*, *McDonald*, and *Bruen*'s 'law-abiding citizen' throughline. Therefore, the Defendant's *Rahimi*-based argument does not disrupt the [c]ourt's prior analysis." *Id*. (cleaned up).

*Rahimi* itself explained that "*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home." 144 S. Ct. at 1902. "In fact," *Rahimi* specifically noted "that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id*.  Nothing in *Rahimi* calls into question *Lane*, *Moore*, or *Pruess*' prior holdings that § 922(g)(1) is presumptively valid.

II.     **Prohibiting firearm possession once a person commits a felony is consistent with the Nation's tradition of firearms regulation.**

Even if the Second Amendment by its terms applies to persons with felony convictions, the Defendant's argument also fails under *Bruen*'s second step, because prohibiting the possession of firearms by felons "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

A. ***Bruen*'s second step does not require the government to identify a historical twin.**

In noting that the government bears the burden as to *Bruen*'s second step, the Supreme Court did not require that the government identify a "historical twin" to the modern-day prohibition. *Id.* at 2133. The Supreme Court recognized that "historical analysis" of laws and regulations that existed in the late-eighteenth century "can be difficult," because "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Id.* at 2131, 2132. Therefore, modern courts may (and often must) conduct "reasoning by analogy," which requires identification of a "well-established and representative historical *analogue*, not a historical *twin.*" *Id.* at 2133. Finally, even where the "historical record yields relatively few" direct examples, those few examples may pass constitutional muster where there is little record of any "disputes regarding the lawfulness of such prohibitions." *Id.*

In *Rahimi*, the Supreme Court clarified that the historical analogy "need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 1898. In upholding the constitutionality of § 922(g)(8) as applied to Rahimi, the Court explained that § 922(g)(8) was "by no means identical" to founding era regimes, but "[i]ts prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.* at 1901; *see also id.* at 1898 ("[W]hen a challenged regulation does not precisely

14

match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" (quoting *Bruen*, 597 U.S. at 30)). *Rahimi* thus concluded that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.*

### B.  History confirms that Congress may disarm persons who are not law-abiding.

Because the Second Amendment "codified a right inherited from our English ancestors," a court should begin with English law. *Rahimi*, 144 S. Ct. at 2127 (citation omitted). Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," a court should also consider evidence of how the Founding generation understood the right. *Id.* at 2136 (citation and emphasis omitted). And because evidence of the "public understanding of a legal text in the period after its enactment or ratification" is probative of original meaning, a court should consider how the Second Amendment was understood in the 19th century. *Heller*, 554 U.S. at 605 (emphasis omitted); *see Bruen*, 142 S. Ct. at 2136-2138. Historical evidence from each of those eras—before, at, and after the Founding—leads to the same conclusion: Congress may disarm persons who are not law-abiding citizens.

*Pre-Founding*. Parliament first recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Id.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Id.* While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones. It thus did not displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome." 14 Car. 2, c. 3, § 13 (Eng.). Consistent with the Militia Act, the Crown often

15

directed local officials to disarm those whom it did not trust to use weapons responsibly —for instance, those who had "disturbed the public Peace."[2] That practice continued after the adoption of the English Bill of Rights.[3] Indeed, many 18th-century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[4]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor."  2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S. Ct. at 2139-2142. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the

---

[2] Privy Council to Lord Newport (Jan. 8, 1661), in Transactions of the Shropshire Archaeological and Natural History Society, pt. 2, 3d ser., vol. 4, at 156 (1904); see, e.g., Calendar of State Papers, Domestic Series, Charles II, 1661-1662, at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); Calendar of State Papers, Domestic Series, 1670, at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); Calendar of State Papers, Domestic Series, May 1,1684–February 5, 1685, at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons").

[3] *See*, e.g., Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), in Historical Manuscripts Commission, Tenth Report, Appendix, Part IV 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), in Historical Manuscripts Commission, Fifteenth Report, Appendix, Part VI 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), in Historical Manuscripts Commission, Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk 148 (1905) (similar).

[4] Robert Gardiner, The Compleat Constable 68 (3d ed. 1708); see, e.g., Giles Jacob, The Modern Justice 338 (1716); W. Nelson, The Office and Authority of a Justice of Peace 464 (7th ed. 1721); G. Jacob, Lex Constitutionis 331 (2d ed. 1737); Theodore Barlow, The Justice of Peace 367 (1745); 2 Joseph Shaw, The Practical Justice of Peace, and Parish and Ward-Officer 231 (6th ed. 1756).

weapons.[5] The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms. The understanding that the government could lawfully disarm irresponsible subjects remained intact at the time of the American Revolution, as one widely discussed episode illustrates. In 1780, London officials reacted to widespread rioting by confiscating the rioters' arms.  *See* Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 130-131 (1994). The House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. *See id*. at 131-132. Members defended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character."[6] The press similarly distinguished "the riotous mob" from "citizens of character."[7] And private groups that supported the right to bear arms warned that the confiscation did not set a precedent for disarming "peaceable Subjects."[8]

In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and responsibly.

---

[5] *See*, e.g., 4 William Blackstone, Commentaries on the Laws of England 149 (10th ed. 1787); 1 Richard Burn, The Justice of the Peace, and Parish Officer 13-14 (2d ed. 1756); 1 William Hawkins, A Treatise of the Pleas of the Crown 135 (1716).

[6] *See*, e.g., 21 The Parliamentary History of England, from The Earliest Period to the Year 1803, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); id. at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").

[7] 49 The London Magazine or Gentleman's Monthly Intelligencer 518 (Nov. 1780); see, e.g., 42 The Scots Magazine 419 (Aug. 1780) (distinguishing "suspicious persons" from "reputable citizens").

[8] *See* 2 The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780, at 139 (1780) (resolutions adopted in York); 1 Remembrancer; or Impartial Repository of Public Events, for the Year 1781, at 24 (1780) (resolutions adopted in Middlesex); id. at 112 (resolutions adopted in Huntingdonshire).

**Founding era.** Many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." The "strongest source" for understanding the Founders' view of the right to bear arms "comes from proposals for the Second Amendment issued by various state conventions." *United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D. W. Va. 2010).

*Heller* identified the Address and Reasons of Dissent of the Minority of the State of Pennsylvania to their Constituents as a "highly influential" "precursor" to the Second Amendment. 554 U.S. at 604. And that proposal suggested that "no law shall be passed for disarming the people or any of them unless for crimes committed."  Bernard Schwartz, 2 *The Bill of Rights, A Documentary History* 662, 665 (1971).  The Pennsylvania proposal is "highly influential" because it "represents the view of the Anti-federalists," the founders who were "advocating for very limited federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights. Even these advocates of broad individual . . . rights viewed the right to possess and carry arms as limited – particularly from those who had committed crimes or were a danger to the public." *Tooley*, 717 F. Supp. 2d at 590.

That the view expressed by the Anti-Federalists in Pennsylvania did not win the day in their own state's vote on ratification is of little moment: their views gained momentum as the various states held their ratifying conventions. Pennsylvania was the second state, after Delaware, to hold its ratifying convention, and the first state to mount a challenge by any portion of its delegates to the Constitution's initial lack of a Bill of Rights. Stephen J. Halbrook, *The Founders' Second Amendment* 171, 191–93 (2008). Eventually, other states followed suit.  In Massachusetts, the sixth state to ratify, "[t]he demand for a bill of rights reached a high pitch." *Id.* at 201. The bill of rights proposed by the Pennsylvania Dissent of Minority "had been

circulated in Boston when the Massachusetts convention met." *Id.* at 208. As in Pennsylvania, those in Massachusetts demanding a Bill of Rights were defeated by their opponents, but by a much narrower margin than the minority in Pennsylvania. *Id.* at 207. Samuel Adams' proposed amendments included language clarifying that "the said Constitution be never construed to authorise Congress . . . or to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *Id.* at 205 (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added),

Finally, in New Hampshire, what had been a minority view in Pennsylvania became a majority: "Insistence on a bill of rights – which mustered the votes only of minorities in the Pennsylvania and Massachusetts conventions – finally commanded a majority in the New Hampshire convention." *Id.* at 215. Like Pennsylvania's proposed Second-Amendment predecessor and Samuel Adams' proposal for Massachusetts, New Hampshire's proposal contained a safety-based limitation. It read, "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." *Id.* at 213. Concerns about citizen-led violence born out of recent events such as Shay's rebellion in Massachusetts inspired the proposal that "'actual' insurgents could be disarmed." *Id.* The government is "aware of no disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2133.

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," venerable," and "widely understood" right, making it unlikely that "different people of

19

the founding period had vastly different conceptions" of its scope. *Id.* at 603-605. The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding citizens.

The Fourth Circuit has repeatedly recognized this historical tradition. "Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has *always* recognized and accommodated limitations for persons perceived to be dangerous." *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) (emphasis added); *accord United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) ("[H]istorical evidence support[s] the notion that the government could disarm individuals who are not law-abiding members of the political community"); *see also Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) ("Where the sovereign has labeled the crime a felony, it represents the sovereign's determination that the crime reflects 'grave misjudgment and maladjustment' . . . . A felon cannot be returned to the category of 'law-abiding, responsible citizens' for the purposes of the Second Amendment").

***Post-Founding***. Antebellum commentators shared the Founding generation's understanding of the Second Amendment's scope. For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, The Statesman, or Principles of Legislation and Law 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one who entitles himself by his demeanor to the protection of his country." *Ibid*. (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." State Convention of the Suffrage men of Rhode Island, Vermont Gazette, Dec. 13, 1842, at 1. And

Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, Prevention of Crime, in O.H. Smith, Early Indiana Trials and Sketches 466-467 (1858). Opponents of slavery voiced similar views during the Bleeding Kansas conflict of the mid-1850s. On the one hand, they supported disarming groups responsible for violence in Kansas. Senator (and future Vice President) Henry Wilson, for instance, complained that "armed bandits" were "violating law, order, and peace," and called for legislation "to disarm any armed bands, from the slave States or the free States, who enter the Territory for unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856).  Senator Benjamin Wade likewise called on Congress to "[d]isarm these lawless bands." *Id.* at 1091. On the other hand, opponents of slavery criticized Kansas authorities for disarming "peaceable" free-state settlers.[9] A petition published in William Lloyd Garrison's newspaper even urged the impeachment of President Pierce for his efforts to disarm "peaceable citizens."  A.J. Grover, Impeachment of Franklin Pierce (Aug. 1, 1856), in The Liberator, Aug. 22, 1856, at 140.

Sources from during the Civil War reflect the same understanding. In 1863, a Union general ordered that "all loyal and peaceable citizens in Missouri will be permitted to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies, ser. 1,

---

[9] *See*, e.g., New-York Daily Tribune, Oct. 2, 1856, at 4 ("When [a Kansas official] entered the houses of peaceable citizens and demanded that they should deliver up their arms, he * * * violated one of those provisions of the Constitution which a free people should guard with the most jealous care."); High-Handed Outrage in Kansas, Holmes County Republican, Oct. 30, 1856, at 1 (denouncing the disarmament of "[p]eaceable American [c]itizens" in Kansas as a violation of their "constitutional rights").

vol. 22, pt. 2, at 475 (1888). A war memoir recounted a Union soldier's belief that "it was unconstitutional to disarm peac[e]able citizens." Chickasaw, The Scout, in R.W. Surby, Grierson Raids 253 (1865). And after the war, Senator Henry Wilson defended Congress's "power to disarm ruffians or traitors, or men who are committing outrages against law or the rights of men." Cong. Globe, 39th Cong., 1st Sess. 915 (1866).

As Reconstruction began, many southern states sought to disarm black citizens, prompting "an outpouring of discussion" about the right to keep and bear arms. *Heller*, 554 U.S. at 614. Participants in that discussion affirmed the right to possess arms for self-defense, yet cautioned that the right protected only "peaceable" or "well-disposed" citizens. In Georgia, for example, the Freedmen's Bureau issued a circular explaining that "[a]ll men, without distinction of color, have the right to keep arms," but that "[a]ny person, white or black, may be disarmed if convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866). The Bureau also recognized that the "freedmen of South Carolina have shown by their peaceful conduct that they can safely be trusted with fire-arms."  H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866). And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-909. Commentators continued to interpret the Second Amendment the same way later in the century. One newspaper article argued that "pistols cannot safely be committed to every irresponsible hand," that the Constitution does not protect "the right of every drunken loafer to bear about in his pocket the implements of murder," and that the right instead belongs only to those "whom it was safe to trust with firearms." The Sale of Pistols, New York Times, June 22, 1874, at 4. Another article referred to the "constitutional right of

every peaceable citizen to carry arms for his own defense." Kansas Legislature: Some Criticisms on Pending Bills, The Topeka Daily Capital, Feb. 2, 1883, at 6.

### C. The Nation has a long history of disarming persons who are not law-abiding.

"[T]his Nation's historical tradition of firearm regulation" further illuminates the Second Amendment's scope. *Bruen*, 142 S. Ct. at 2126. And the United States has a longstanding tradition, dating to colonial times and continuing to the present, of disarming persons whom legislatures have found are not law-abiding, responsible citizens. Most relevant here, early American legislatures denied arms to classes of individuals considered unfit to possess them. When the Revolutionary War began, for example, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic.[10] Similarly, after putting down Shays' Rebellion in 1787, Massachusetts required the rebels, as a condition of being pardoned, to surrender their arms, which would be returned to them after three years if they kept the peace.[11]

---

[10] *See* 4 Journals of the Continental Congress 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, Acts of the General Assembly of the State of New-Jersey 90 (1777); Act of 1777, ch. 6, § 9, 24 The State Records of North Carolina 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 Acts and Resolves, Public and Private, of the Province of Massachusetts Bay 480 (1886); Resolves of Apr. 6, 1776, 8 The Statutes at Large of Pennsylvania from 1682-1801, at 559-561 (1902); Act of 1776, 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 282 (William Waller Hening ed., 1821).

[11] *See* Act of Feb. 16, 1787, §§ 1-3, 1 Private and Special Statutes of the Commonwealth of Massachusetts 145-147 (1805).

Colonies and early States also punished irresponsible use of arms with forfeiture of the arms. Early American justice-of-the-peace manuals explained that the Statute of Northampton— which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 5 Pet. 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[12] Some 17th- and 18th-century American statutes expressly recodified that rule.[13] Others made forfeiture part of the penalty for offenses such as unsafe storage of guns or gunpowder.[14] Although those laws involved forfeiture of arms involved in an offense rather than bans on possessing arms, they show that legislatures could restrict an individual's ability to bear arms if his conduct suggested that he would not use them responsibly. A few decades later, states began to adopt surety statutes that required certain potentially dangerous individuals who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if

---

[12] *See*, e.g., James Davis, The Office and Authority of a Justice of Peace 5 (1774) (N.C.); Joseph Greenleaf, An Abridgment of Burn's Justice of the Peace and Parish Officer 12-13 (1773) (Mass.); William Waller Hening, The New Virginia Justice 18 (1795) (Va.); Eliphalet Ladd, Burn's Abridgement, Or The American Justice 22- 24 (2d ed. 1792) (N.H.); James Parker, Conductor Generalis 12 (1764) (N.J.); James Parker, Conductor Generalis 12 (Robert Hodge printing 1788) (N.Y.); James Parker, Conductor Generalis 11 (Robert Campbell printing 1792) (Pa.).

[13] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 Acts and Resolves of the Province of Massachusetts Bay 52-53 (1869); Act of June 14, 1701, ch. 7, 1 Laws of New Hampshire 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force 33 (1794).

[14] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, The Laws of the State of New Hampshire 460 (1815); Ordinance of Oct. 9, 1652, Laws and Ordinances of New Netherland, 1638-1674, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 Laws of the State of New-York, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 The Statutes at Large of Pennsylvania from 1682 to 1801, at 209-210 (1906).

his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense.  Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 142 S. Ct. at 2148 n.23 (collecting statutes). Those laws, too, confirm that potentially dangerous individuals were subject to special restrictions that did not (indeed, could not) apply to ordinary, law-abiding citizens. *See id*. at 2122 (holding a proper-cause requirement unconstitutional as applied to ordinary citizens). Continuing in the 19th century, as guns became more lethal and more widely available, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms. At least 29 jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages.[15] Several states banned the sale of guns to persons of

---

[15] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140

unsound mind.[16] At least a dozen States disarmed "tramps," that is, vagrants.[17] Some states

forbade intoxicated persons from buying or carrying guns.[18] One state forbade the carrying of

arms by "any person who has ever borne arms against the government of the United States."[19]

Another disarmed certain individuals in identified categories if they were "not known to be

peaceable and quiet persons."[20]

State courts upheld such laws on the ground that the disqualified individuals were apt to

use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying

arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be

apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W.

468, 469 (1886). And the Ohio Supreme Court explained that a law disarming "tramps" was

consistent with the right to keep and bear arms because that right "was never intended as a

warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58

---

[16] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[17] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[18] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

[19] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.

[20] *See* Act of Apr. 30, 1855, §§ 1-2, in 2 The General Laws of the State of California, from 1850 to 1864, inclusive 1076-1077 (Theodore H. Hitchell ed., 1865).

N.E. 572, 575 (1900). The tradition of disarming unfit persons continued into the 20th century. In the 1930s, Congress disqualified violent criminals, fugitives from justice, and persons under felony indictment. *See* Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251. In the 1960s, Congress disqualified felons in general, drug users and addicts, and persons with mental illnesses. *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220. In the 1980s, Congress disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces. *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452. And in the 1990s, Congress disarmed persons subject to domestic-violence protective orders, *see* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110401(c), 108 Stat. 2014, and domestic violence misdemeanants, *see* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A, Tit. I, Sec. 101(f) [tit. VI, § 658(b)(2)], 110 Stat. 3009- 372. That series of statutes reflects Congress's longstanding judgment that "firearms must be kept away from persons * * * who might be expected to misuse them." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983).

Although the government has not identified a "historical twin" to felon-in-possession laws from the Founding Era, several "historical analogues" demonstrate that § 922(g)(1) is consistent with the Founders' view of reasonable limits on gun possession. *Bruen*, 142 S. Ct. at 2133. Thus, the government has met its burden under *Bruen*'s second step to show that § 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126; *see also Rahimi*, 144 S. Ct. at 1898 ("[W]hen a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'")

(quoting *Bruen*, 597 U.S. at 30); *id*. at 1901 ("Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be.").

**D.  *Rahimi* does not undermine the government's historical evidence.**

Relying on *Rahimi*, the Defendant attempts to undermine the government's ample historical evidence. The Defendant does so by setting up a false premise. Employing *Bruen*'s historical test, *Rahimi* upheld § 922(g)(8) because "[i]ts prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Rahimi*, 144 S. Ct. at 1901. The Defendant seizes on this holding to argue that § 922(g)(1) is unconstitutional because it is too unlike the surety laws and going armed statutes found sufficient in *Rahimi*.  *See* ECF No. 42 at 12-13.  But the Defendant confuses what was sufficient to satisfy *Bruen* in *Rahimi* with what is necessary to do so here.

As in "*Heller*, *McDonald*, and *Bruen*," *Rahimi* did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Rahimi*, 144 S. Ct. at 1903 (quoting *Bruen*, 597 U.S. at 31). Instead, *Rahimi* addressed only whether § 922(g)(8) was facially unconstitutional. In doing so, *Rahimi*  held that "individual[s] found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id*. "[B]ut the Court did not hold that only those individuals may be temporarily disarmed." *United States v. Levasseur*, No. 1:22-cr-155, 2024 WL 3358221, at *3 (D. Me. July 9, 2024). "Instead, the Supreme Court advised that it did 'not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse.'" *Id*. (quoting *Rahimi*, 144 S. Ct. at 1901). "Similarly, while the Supreme Court emphasized § 922(g)(8)'s temporary restriction on Rahimi's Second Amendment rights, the

Court's holding did not turn on that feature." *Id*. In the wake of *Rahimi*, numerous courts have continued rejecting as-applied challenges to § 922(g)(1). *See, e.g.*, *United States v. Wilson*, No. 23-cr-20621, 2024 WL 3331628 (E.D. Mich. July 8, 2024) (canvassing extensive historical record); *see also United States v. Atikins*, No. 5:24-cr-29, 2024 WL 3316992, at *3 (E.D. Ky. July 5, 2024) (relying on *Rahimi*'s discussion of going armed laws to uphold § 922(g)(1)).

  *Rahimi*, criticizing "some courts [that] have misunderstood the methodology of [the Court's] recent Second Amendment cases," specifically explained that its "precedents were not meant to suggest a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897. "[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id*. at 1897–1898. "Holding otherwise," *Rahimi* explained, "would be as mistaken as applying the protections of the right only to muskets and sabers." *Id*. at 1898. *Rahimi*'s rejection of the requirement that the government locate a "historical twin," and its clarification that historical precursors, still may be analogous enough to pass constitutional muster," *id*., supports the continued validity of § 922(g)(1). As one court put it, "*Rahimi*, if anything, bolsters § 922(g)(1)'s constitutionality." *United States v. Morales*, No. 24-cr-84, 2024 WL 3345982, at *2 (S.D.N.Y. July 8, 2024) (citing cases holding the same). Since *Rahimi*, Judge Novak has also reaffirmed his earlier decision in *United States v. Coleman*, No. 3:22-cr-87, 2023 WL 6690935, at *11 (E.D. Va. Oct. 12, 2023), explaining that "[n]othing in *Rahimi* disturbs either the Fourth Circuit's holding in *Canada* or this Court's holding in *Coleman*." *United States v. Wright*, No. 3:24-cr-53, Dkt. No. 20  (E.D. Va. July 1, 2024). Among other things, *Coleman* held that "the Government has borne its historical burden by showing that a longstanding tradition, one that the Fourth Circuit itself described as robust, of disarming both violent and nonviolent felons exist." *Coleman*, No. 3:22-cr-87, 2023 WL 6690935, at *15.

## Conclusion

For the foregoing reasons, the Court should deny the Defendant's motion.

Respectfully submitted,

JESSICA D. ABER
United States Attorney

By: _____/s/_____
Katherine E. Groover
Virginia Bar Number 89213
Special Assistant United States Attorney
Office of the United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone:  804-819-5400
Fax:     804-771-2316
Katherine.groover@usdoj.gov