IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:24-cr-122-RCY |
| WILLIAM THOMAS MORTON, JR., | |
| Defendant. | |

### THE GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS NINE, TEN, AND FOURTEEN

During the month of April 2024, William Thomas Morton, Jr. (hereinafter "the defendant") and his codefendant, Raekwon Jamil Mahone, engaged in unlicensed firearms dealing of multiple firearms to an individual whom they knew was a convicted felon and lived outside of the Commonwealth of Virginia. On multiple occasions, the defendant, who is a convicted felon, sold or participated in the sale of firearms, in exchange for hundreds of dollars.

Both defendants were charged with engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A); the defendant was additionally charged with selling a firearm to an out-of-state resident, in violation of 18 U.S.C. § 922(a)(5). The defendant claims that both statutes infringe on his Second Amendment rights, based on *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) and *District of Columbia v. Heller*, 554 U.S. 570 (2008), and that this Court should dismiss Counts Nine, Ten, and Fourteen of the Indictment. ECF No. 41. The defendant's motion should be denied.

The Supreme Court and Circuits around the United States have repeatedly recognized that the Second Amendment safeguards an individual right of law-abiding citizens – not felons- to possess and carry weapons for self-defense. But the Second Amendment does not confer a

1

"freestanding" right to engage in firearms commerce divorced from the citizenry's right to possess firearms. See *Teixeira v. County of Alameda*, 873 F.3d 670, 682-86 (9th Cir. 2017) (*en banc*). *Bruen* reinforced these basic principles. In *Bruen*, the Supreme Court reiterated more than a dozen times that the right to keep and bear arms belongs to law-abiding citizens; this Court's decision in *United States v. Lane*, 689 F. Supp. 3d 232, 243 (E.D. Va. Aug. 31, 2023), said the same thing.

*Bruen* casts no doubt on longstanding prohibitions on the possession of firearms by felons. Thus, as its text and historical record establish, the Second Amendment does not protect selling firearms to felons, because felons have no right to possess firearms in the first place. Similarly, in *Bruen*, the Supreme Court explicitly approved of licensing regimes that do not encroach on law-abiding citizens' ability to exercise their Second Amendment right. The Ninth Circuit's decision in *Teixeira* stands for the same principle. *See* 873 F.3d at 682-86.

The unlicensed-dealing prohibition, 18 U.S.C. § 922(a)(1)(A), encroaches on no one's right: it requires only that those individuals who wish to sell or manufacture firearms commercially obtain a license. Individuals otherwise remain free to possess or acquire firearms, and even to sell or manufacture firearms for a non-commercial purpose. The statute does not implicate, much less infringe upon, law-abiding citizens' right to possess and carry firearms for self-defense.

Similarly, the Second Amendment does not protect the ability to sell firearms to out-of-state residents, in violation of 18 U.S.C. § 922(a)(5), who then carry them across state lines for the purpose of selling the firearms in another state. Because the offenses with which the defendant has been charged are not protected under the Second Amendment, and are consistent with the

historical understanding of the right to bear arms, the defendant's motion to dismiss should be denied.

## Background

In the spring of 2024, special agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), in Richmond, Virginia, utilized two confidential informants ("CIs") to purchase narcotics and firearms from individuals in the City of Richmond. Their goal was to address rising violent crime, stemming from firearms and narcotics trafficking in the most violent areas of the city. The CIs were paid by ATF agents to make controlled buys of narcotics and firearms between March and August, 2024. One of the CIs was a convicted felon, and not a resident of the Commonwealth of Virginia. He was flown to Virginia to purchase narcotics and firearms on behalf of ATF. In April 2024, the CI was introduced to the defendant by the defendant's girlfriend. When the CI first met the defendant, he purchased narcotics and a firearm from the defendant. The defendant also introduced the CI to his co-defendants, Raekwon Mahone and Shamir Young, as additional firearms suppliers. The defendant was told that the CI was not from Virginia, and that he was taking the firearms up to New Jersey to re-sell.

Between April 1 and April 23, 2024, the defendant sold or participated in the sale of nine firearms, which included privately made firearms, or "ghost guns," and rifles, to the CI. The defendant received hundreds of dollars for selling firearms to the CI. Even when the defendant was not the seller of the firearms, but "brokered" the deals between the CI and either Mr. Mahone or Mr. Black, the defendant was paid a "broker fee," which averaged around $100 per sale. The defendant made these sales as a convicted felon, without a license to sell firearms, and did so knowing that the CI was not a resident of the Commonwealth and that he intended to traffic the firearms for sale in another state.

3

## Argument

**I.     The Second Amendment Protects the Right of a Law-Abiding Citizen to Possess and Carry Weapons.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. 570, 595 (2008).  In doing so, the Court interpreted the operative language of the Amendment—"keep and bear Arms"—and explained that "the most natural reading of 'keep Arms' . . . is to 'have weapons'" and that "'bear arms'" is naturally read to mean "'wear, bear, or carry . . . upon the person or in clothing or in a pocket for the purpose . . . of being armed and ready for offensive or defensive action in case of conflict with another person.'"  *Id.* at 582, 84.  From there, the Court determined that the Amendment "protects the 'law-abiding, responsible' citizen's possession of arms for the 'lawful purpose of self-defense.'" *United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023) (quoting *Heller*, 554 U.S. at 576-603).

*Heller* specifically identified the right to keep and bear arms as belonging to "law-abiding, responsible citizens." *Id.* at 635.  As the Court explained, "the right secured by the Second Amendment is not unlimited."  554 U.S. at 626; *cf. id.* at 635 (noting by way of analogy that certain types of speech, including "obscenity, libel, and disclosure of state secrets," fall outside the scope of the First Amendment's free speech clause).  The Court specifically stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms"—all of which the Court deemed "presumptively lawful." *Id.* at 626-27 & n.26.  Indeed, when discussing the plaintiff (Heller) himself, the Court

4

held that he would be entitled to keep a handgun in his home "[a]ssuming" that he is "not disqualified from the exercise of Second Amendment rights." *Id.* at 635; *see also id.* at 631 (noting the assumption that Heller was "not a felon").

The Court has adhered to this understanding in the decades since *Heller* was decided. Two years after *Heller*, in *McDonald v. City of Chicago*, a plurality of the Court similarly observed that the Second Amendment protects "the safety of . . . law-abiding members of the community." 561 U.S. at 790.  There, the Court also "repeat[ed]" the "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons . . . , or laws imposing conditions and qualifications on the commercial sale of firearms.'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626-27).

## II.     The Second Amendment does not create a freestanding right to sell firearms.

In defining the scope of the Second Amendment—*i.e.*, the right of law-abiding citizens to possess and carry firearms for self-defense—the Ninth Circuit recognized that the Amendment protects "ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira*, 873 F.3d at 677; *see also Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms.").  Such "ancillary rights" include possessing ammunition, practicing firing the weapon, and acquiring the weapon in the first place. 873 F.3d at 677-78.  But the Second Amendment does not confer "a freestanding right, wholly detached from any customers ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Id.* at 682.  "Keep and bear" does not include "sell or trade." *Id.* at 683; *see also id.* at 689 ("the act of selling firearms is not part or parcel of the right to 'keep and bear arms'").  "Nothing in the text of the Amendment . . . confers

an independent right to sell or trade weapons." *Id.* at 683 (noting that no Founding-era state constitution "extend[ed] to those who would engage in firearms commerce" and that the "right to sell firearms was not within the historical understanding" of the right in 17th and 18th century England).

As the court in *Teixeira* explained, the question is whether any regulation of the ancillary right "meaningfully constrain[s]" someone's actual right. *Id.* at 680.  In *Teixeira*, a gun-store owner challenged a county ordinance that prohibited gun stores from being located within 500 feet of schools, day care centers, liquor stores, other gun stores, and residential neighborhoods. *Id.* at 674.  The gun-store owner claimed, among other things, that the Second Amendment guaranteed a "right to sell firearms," "independent of the rights of his potential customers."  *Id.* at 681.  But the Court disagreed, explaining that the holder of the right was the gun *buyer* (and ultimate possessor), and that there was no evidence that a single "honest-to-God resident" of the county could not "lawfully buy a gun nearby." *Id.* at 680-81.  Driving a little further or "walking a few extra blocks" to buy a gun is not an infringement on anyone's right to keep and bear arms. *Id.* (quotation marks omitted).

The Ninth Circuit contrasted that to the very different situation presented by a regulation that effectively banned the sale of firearms anywhere in the county. *Id.* at 679 (discussing *Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017)), where zoning regulations prevented any firing range from operating within city limits).  Thus, the threshold question was necessarily whether a given regulation "infringe[s]" on someone's right to "keep and bear" arms—if not, the Second Amendment is not implicated.  *Id.*

The Court in *Teixeira* did not apply intermediate scrutiny, strict scrutiny, or any "means-end" scrutiny balancing the costs and benefits of the ordinance at issue.  To the contrary, the

6

Court "conduct[ed] a full textual and historical review," *id.* at 683, examining the Second Amendment's text and history at length, *see id.* at 683-90, before concluding that the ordinance limiting a gun store's ability to sell in a certain location did "not burden conduct falling within the Amendment's scope." *Id.* at 690. And without a direct violation of the plaintiff's right to sell guns, or any indirect violation of a customer's right to "keep and bear" them, there could be no Second Amendment violation.

The defendant has made no argument that *Bruen* overruled the Ninth Circuit's textual holding in *Teixeira* that there is no freestanding right to sell guns. *Teixeira* is still good law, and undisturbed by *Bruen*. *Bruen* did not "upend" every Second Amendment decision that has ever been decided. Rather, *Bruen* instructed courts to look to the "text and history" of the Second Amendment to determine its scope, as the Court did in *Heller*, 554 U.S. at 595, and as the Ninth Circuit did in *Teixeira*, 873 F.3d at 682-90 (conducting a "full textual and historical review"). All the Supreme Court did in *Bruen* was to reaffirm this focus on "the Second Amendment's text, as informed by history." 142 S. Ct. at 2127; *see also id.* at 2128-29 ("constitutional text and history"). Thus, the defendant's argument, that sections 922(a)(1)(A) and 922(a)(5) are unconstitutional because they regulate conduct protected by the plain text of the Second Amendment, is incorrect and fails.

### III.     Sections 922(a)(1)(A) and 922(a)(5) are Commercial Restrictions that Do Not Infringe on a Law-Abiding Citizen's Right to Keep and Bear Arms.

As set forth above, the Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. Where the validity of a restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As this Court has already held, felons are not part of the "the people" covered by the Second amendment. *See Lane*, 689 F. Supp. 3d at 248.

And as the Ninth Circuit held in *Teixeira*, 873 F.3d at 683, there is no "independent right to sell or trade weapons" absent an infringement on someone else's right to possess them.  These two principles foreclose the defendant's arguments.

**A.  Section 922(a)(1)(A)'s prohibition on unlicensed gun dealing is constitutional.**

Section 922(a)(1)(A) does not implicate the Second Amendment at all.  And even if it did, the Fourth Circuit has already held that the prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of arms and is thus constitutional.  *See United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016).

To begin, the question before the Court is a limited one.  Section 922(a)(1)(A) forbids anyone "except a licensed importer, manufacturer, and dealer of firearms," to "willfully engage in the business of importing, manufacturing, and dealing in firearms." 18 U.S.C. § 922(a)(1)(A).  Here, the defendant is alleged to have dealt in or sold firearms, without a license to do so.  Thus, the Court need only assess whether the Second Amendment encompasses a person's right to deal in firearms without a license as a regular course of trade or business to make a profit.  The statute does not impact defendant's ability to keep or bear arms, to manufacture firearms for non-commercial purposes, or even to commercially import, manufacture and sell firearms *with a license*.  And in the words of *Bruen*, this is a "shall-issue" license: a prospective dealer who wishes to obtain a license need only submit an application, be at least twenty-one years old, pay a fee, and establish lawful premises for selling firearms. 18 U.S.C. § 923(a), (d).  If the applicant fulfills these steps and is otherwise legally able to possess, transport, and ship firearms, the application must be approved. 18 U.S.C. § 923(d).  None of this violates anyone's right "to keep and bear Arms." U.S. Const. amend. II.

As explained in *Heller*, "keep" means to "have weapons" and "bear" means to "carry" weapons. 554 U.S. at 582, 584 (quotations omitted). The defendant's charged conduct— *unlicensed* dealing of firearms for a profit—does not fall within that operative language, as defined in *Heller*. *See Teixeira*, 873 F.3d at 683 ("Nothing in the text of the Amendment, as interpreted authoritatively in *Heller*, suggests the Second Amendment confers an independent right to sell or trade weapons."). *Bruen* reinforced the meaning that *Heller* and *McDonald* affixed to the Second Amendment. The Court examined whether the Second Amendment protected petitioners Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense. 142 S. Ct. 2134-35. Answering affirmatively, the Court relied on *Heller* and stated that the "'textual elements'" of the Amendment's "operative clause" "guarantee the individual right to possess and carry weapons in case of confrontation." 142 S. Ct. 2134. Nothing in *Bruen* suggests, much less implies, that the operative language extends to the unlicensed sale of firearms.

To the contrary, and as noted, the Court explicitly approved of state "shall-issue" licensing regimes so long as those laws do not deny law-abiding citizens their right to keep and bear arms, *id.* at 2138 n.9, and the concurring justices clarified that "[n]othing" in its decision "should be taken to cast doubt on longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms," which are "presumptively lawful," *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting *Heller*, 554 U.S. at 626-27 n.26 and *McDonald*, 561 U.S. at 786). Indeed, following *Bruen*, the district courts that have reached the issue have rejected challenges to the constitutionality of § 922(a)(1)(A). *See, e.g.*, *United States v. Deare*, No. 6:21-cr-00212-01, 2023 WL 4732568, at *2 (W.D. La. July 24, 2023) (agreeing that licensing/recordkeeping requirements of 18 U.S.C. § 922(a)(1) "do not affect an individual's

rights to possess firearms"); *United States v. Kazmende*, No. 1:22-cr-236-SDG-CCB, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023), *report and recommendation adopted*, No. 1:22-cr-00236-SDG, 2023 WL 3867792 (N.D. Ga. June 7, 2023) (The Second Amendment "simply does not extend to the commercial sale of firearms."); *United States v. McNulty*, No. 22-cr-10037-WGY, 2023 WL 4826950, at *4 (D. Mass. July 27, 2023) (same); *United States v. Flores*, — F. Supp. 3d —, 2023 WL 361868, at *4-5 (S.D. Tex. Jan. 23, 2023) (same); *United States v. King*, No. 5:22-cr-00215-001, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022) (same); *United States v. Tilotta*, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) ("[T]he natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted."). As these authorities reflect, *Bruen* did not assign a new meaning to the Second Amendment that would confer a right to engage in firearms commerce without a license.  Thus, the defendant's arguments that the "plain text of the Second Amendment…covers…the right of one citizen to buy and sell firearms," ECF No. 41 at 4, is mistaken.

As to the defendant's argument that the "text of the Second Amendment was that it always included the right to purchase and resell arms," ECF No. 41 at 5, the Ninth Circuit has already held that the Second Amendment does not confer a "freestanding right to engage in firearms commerce," much less to do so without a license, "divorced from the citizenry's ability to obtain and use guns." *Teixeira*, 873 F.3d at 684.  As the Court in *Teixeira* held, the "core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms," *id.* at 677.  But, the licensing regulation does not encroach on any law-abiding citizen's ability to acquire firearms—and the defendant certainly has made no showing that a single law-abiding citizen could not acquire a firearm as a result of this regulation prohibiting his conduct.  Nor could he.

Nothing in § 922(a)(1) prohibits individuals from possessing firearms for self-defense, or purchasing or selling firearms owned for personal, self-defensive use. *See Hosford*, 843 F.3d at 168. Section 922(a)(1)(A) "merely imposes a licensing requirement on those who wish to profit by regularly selling firearms outside of their personal collection; it serves, not as a prohibition, but as a condition or qualification." *Id.* That is not an effective ban, or even close—it prevents no one with a right to possess a firearm from doing so. *Cf. Teixeira*, 873 F.3d at 680. The defendant's logic would conflate requiring a license to operate a shooting range with effectively banning all shooting ranges. *Id.* at 679 (discussing *Ezell*, 846 F.3d at 894). That is not the law. In sum, because § 922(a)(1)(A) does not "prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right," it is no different than the licensing regimes that *Bruen* approved. 142 S. Ct. at 2138 n.9. Accordingly, the regulated conduct falls outside the Second Amendment.

Finally, although unnecessary to reach, 922(a)(1)(A)'s licensing requirement is consistent with the Nation's historical tradition of firearms regulation. As discussed above, the Ninth Circuit has already concluded that the historical record dating back to the 1600s and continuing through the Founding establishes that the Second Amendment did not encompass "an independent right to engage in firearms commerce." *Teixeira*, 873 F.3d at 684-85 ("colonial governments substantially controlled the firearms trade"); *id.* at 685 ("The government provided and stored guns, controlled the conditions of trade, and financially supported private firearms manufacturers (citing Solomon K. Smith, *Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*, 49th Parallel, Vol. 34, at 6-8, 18-19 (2014)); *id.* (explaining that "colonial government regulation included some restrictions on the commercial sale of firearms" and citing statutes); *see supra* Section V.B.4. The defendant

ignores the historical analysis set forth in *Teixeira*.  Accordingly, § 922(a)(1)(A)'s licensing requirement complies with the Second Amendment.

**B.  Section 922(a)(5) prohibition on selling firearms to out-of-state residents is constitutional.**

The Second Amendment protects the right of the people "to keep and bear Arms."  The first step of the analysis required by *Bruen* is for the Court to determine whether the "Second Amendment's plain text covers an individual's conduct."  *Bruen*, 142 S. Ct. at 2126.  The Supreme Court has already interpreted the plain text of the Second Amendment's right to "keep and bear Arms" in *Heller*.  *Heller*, 554 U.S. at 581–92.  According to the Supreme Court, "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"  *Id.* at 582.  To "bear" arms means to "carry" for "the purpose of 'offensive or defensive action.'"  *Id.* at 584.  The text does not cover the defendant's conduct.  The defendant did not keep the firearms; he sold them or participated in the selling of them by turning a profit.

The charged offense in Count Fourteen focused on the defendant's transfer and sale of a firearm, but the text of the Second Amendment is plainly tethered to the concepts of possession and retention.  The defendant, therefore, cannot establish that his conduct was covered by the plain text of the Second Amendment.  *See Teixeira*, 873 F.3d at 683 (concluding that the text of the Second Amendment "confers a right on the 'people' who would keep and use arms, not those desiring to sell them").

Because the text of the Second Amendment does not reach the transfer or sale of arms, it is unsurprising that the Supreme Court and Courts of Appeals have looked favorably on laws, like the ones at issue here, that impose marginal restrictions on those activities.  *See Heller*, 554 U.S. at 626–27 & n.26 ("laws imposing conditions and qualifications on the commercial sale of

arms" are "presumptively lawful regulatory measures"); *McDonald*, 561 U.S. at 786 (repeating those "assurances" from *Heller*); *United States v. Decastro*, 682 F.3d 160, 164–69 (2d Cir. 2012) (rejecting Second Amendment challenge to 18 U.S.C. § 922(a)(3)); *United States v. Hosford*, 843 F.3d at 170–71 (rejecting Second Amendment challenge to 18 U.S.C. § 922(a)(1)); *Mance v. Sessions*, 896 F.3d 699, 701 (5th Cir. 2018) (per curiam) (rejecting Second Amendment challenge to 18 U.S.C. § 922(a)(3)); *United States v. Focia*, 869 F.3d 1269, 1285–87 (11th Cir. 2017) (rejecting Second Amendment challenge to 18 U.S.C. § 922(a)(5)).

To claim the Second Amendment's protection, the defendant focuses on the word "infringe" rather than the phrase "keep and bear Arms." *See* ECF No. 41 at 5. That focus is at odds with *Heller*, which identifies the phrase "keep and bear Arms" as the one that delineates the "substance" of the Second Amendment right. *See Heller*, 554 U.S. at 581. *Heller* requires that the inquiry remain focused on the defendant's ability to "keep and bear"—*i.e.,* possess and carry—arms for his individual self-defense. And, for the reasons explained above, the challenged law does nothing to "infringe" upon that particular interest.

Several Courts of Appeals have likewise concluded that regulations on the transfer or sale of arms do not meaningfully infringe an individual's right to possess them. *See Decastro*, 682 F.3d at 168 (explaining that 18 U.S.C. § 922(a)(3) "does nothing" to keep someone from purchasing a firearm in her home state and "does not substantially burden" the right to keep and bear arms); *Hosford*, 843 F.3d at 168 (concluding that the prohibition in 18 U.S.C. § 922(a)(1) against unlicensed firearms dealing does not touch on "the Second Amendment's core protections" or "self-defense concerns"); *Teixeira*, 873 F.3d at 687 (concluding that "restrictions on a commercial actor's ability to enter the firearms market may . . . have little or no impact on the ability of individuals to exercise their Second Amendment right to keep and bear arms");

*Focia*, 869 F.3d at 1286 (explaining that 18 U.S.C. § 922(a)(5) "only minimally affects the ability to acquire a firearm").  As in those cases, the restrictions on the defendant's ability to willfully sell a firearm to an out-of-state resident is unconnected to his ability to "keep and bear" it for self-defense.  For that reason, his motion to dismiss should be denied.

The challenged law is also "consistent with this Nation's historical tradition of firearms regulations."  *Bruen*, 142 S. Ct. at 2126.  Thus, even if the Court concludes that the plain text of the Second Amendment covers the defendant's sale of a firearms to an out-of-state resident, the challenged law is consistent with the Nation's historical tradition of firearms regulations.  The defendant's motion to dismiss Count Fourteen of the Indictment should be denied.

Title 18 U.S.C. § 922(a)(5) was adopted as part of the Gun Control Act of 1968.  The purpose of that Act was to "'strengthen Federal controls over interstate commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders.'"  *United States v. Colicchio*, 470 F.2d 977, 979 (4th Cir. 1972) (quoting House Report No. 1577 to H.R. 17735 (P.L. 90-618)).  And "[a] major purpose of § 922(a)(5) was to regulate practices whereby persons traveled across state lines to obtain guns in states with less restrictive laws." *United States v. Schwab*, 710 F. Supp. 419, 421 (D. Conn. 1989) (citing Senate Report No. 1097, Omnibus Crime Control and Safe Streets Act of 1968).  Even since the colonial era, governments have "substantially controlled the firearms trade." *Teixeira*, 873 F.3d at 685.

In *Teixeira*, the Court of Appeals for the Ninth Circuit surveyed that history.  Notably, it found that "[a]t least two colonies" controlled "where settlers could transport or sell guns." *Id*. "Connecticut banned the sale of firearms by its residents outside the colony."  *Id.* (citing 1 Trumbull, *Public Records of the Colony of Connecticut*, 138–39, 145–46).  Virginia law provided that residents were at "'liberty to sell armes and ammunition to any of his majesties

loyall subjects *inhabiting this colony*.'"  *Id.* at 685 n.18 (emphasis added) (quoting Laws of Va., Feb., 1676–77, Va. Stat. at Large).  Likewise, several colonial governments "passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." *Id.* at 685 (collecting sources).  Restrictions of this kind were unproblematic because, at the time of the founding, "no contemporary commentary suggests that the right codified in the Second Amendment independently created a commercial entitlement to sell guns if the right of the people to obtain and bear arms was not compromised." *Id.* at 686.  The same is true today.

Because Section 922(a)(5) represents only a marginal infringement on the ability to transfer a firearm, and does not infringe upon the people's right to possess them, it is akin to "presumptively lawful" conditions on the commercial sale of arms.  *See Heller*, 554 U.S. at 626–67 & n.26.  Even if the Second Amendment protects conduct covered by section 922(a)(5), the statute is consistent with this Nation's historical tradition of firearms regulation.  Therefore, the defendant's motion to dismiss Count Fourteen should be denied.

## Conclusion

For the foregoing reasons, the Court should deny the defendant's motion to dismiss.

Respectfully submitted,

JESSICA D. ABER
United States Attorney

By:    _____/s/_____
Katherine E. Groover

Virginia Bar Number 89213
Special Assistant United States Attorney
Office of the United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone:  804-819-5400
Fax:    804-771-2316
Katherine.groover@usdoj.gov