IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 3:24-cr-122-RCY-1 |
| ) | |
| WILLIAM THOMAS MORTON, JR., ) | |
| Defendant. ) | |

**MR. MORTON'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS MOTION TO DISMISS COUNTS TWO AND THIRTEEN OF THE INDICTMENT**

There is nothing in the government's response brief, *see* ECF No. 49, that changes the fact that William Thomas Morton, Jr. is part of the "people" for the purposes of the Second Amendment or that his conduct is covered by the plain text of the Second Amendment. His conduct in possessing firearms is thus presumptively constitutional at step one of the analysis in *New York State Rifle & Pistol Association, Inc., et al. v. Bruen*, 597 U.S.1 (2022). The Supreme Court's decision in *United States v. Rahimi*, 602 U.S. ----, 144 S. Ct. 1889 (2024), has effectively foreclosed the government's argument that the Second Amendment applies only to "law-abiding citizens."

The burden at step two is on the government to show a historical practice that is sufficiently similar in both *why* it banned firearms possession and *how* it did so. The government has not met that burden and has instead produced historical evidence of prohibitions of those who were deemed "dangerous" or "irresponsible." The Supreme Court in *Rahimi* rejected those arguments. Therefore, the Court should grant Mr. Morton's motion and dismiss Counts Two and Thirteen of the Indictment.

    **I.**    ***Neither* Heller *nor pre-*Bruen *Fourth Circuit case law foreclose Mr. Morton's claims in this case.***

1

The government has argued that 18 U.S.C. § 922(g)(1) remains constitutional post-*Bruen* because of (1) dictum about felon-disarmament laws in *Heller* and (2) the Fourth Circuit's post-*Heller*/pre-*Bruen* treatment of § 922(g)(1). Neither establishes § 922(g)(1)'s constitutionality.

  a. The *Heller* dictum

After completing its historical survey, and before assessing the constitutionality of the District of Columbia's statutes, the *Heller* Court inserted some "precautionary language." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc). The Court wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). It went on:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court described these prohibitions as "presumptively lawful regulatory measures." *Id.* at 627 n.26.

Here, the government argues that *Heller* thus conclusively holds that felon-disarmament laws are consistent with the Second Amendment. That view is mistaken. The question of felon-disarmament laws' constitutionality was not before the *Heller* Court, and any statements in the opinion addressing that question are thus "dicta." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *accord Tyler*, 837 F.3d at 686-87; *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *see also United States v. Lane*, --- F. Supp. 3d ----, 2023 WL 5663084, at *4 (E.D. Va. Aug. 31, 2023) (Young, J.) ("As an important threshold matter, contrary to the Government's assertion, these statements from *Heller* do not constitute *Heller*'s holding.").

*Heller*'s discussion of "presumptively lawful regulatory measures" is exactly the kind of Supreme Court dicta unentitled to "talismanic effect." *In re Bateman*, 515 F.3d 272, 282, 283 (4th Cir. 2008) (refusing to "afford[] talismanic effect" to unexplained Supreme Court dicta). That dictum was "unaccompanied by any analysis," *id.*, and was—at best— "peripheral" to the questions at issue, *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021). The *Heller* Court provided no "extended discussion," or even abbreviated discussion, of felon-disarmament laws. *Hengle*, 19 F.4th at 346. The Court "never actually addressed the historical pedigree" of the laws listed. *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019). Indeed, the *Heller* Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626.

Regardless, even if the *Heller* dictum might once have warranted deference, it no longer does after *Bruen* and *Rahimi*. The *Rahimi* Court made clear this language from *Heller* did not originate from the Court's case law. *Rahimi*, 144 S. Ct. at 1903. Rather, *Heller*'s use of the word "responsible" simply denoted one group who were unquestionably part of "the people" of the Second Amendment; it did not define "the people" in its entirety. *Rahimi*, 144 S. Ct. at 1903. Further, *Bruen* did not repeat *Heller*'s statements about the presumptive lawfulness of any statute. The only time that the *Bruen* majority discussed a presumption of lawfulness is when discussing that when the plain text of the Second Amendment covers the purportedly prohibited conduct, the "[c]onstitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Rather than finding that **any** gun regulation is presumptively lawful, the *Bruen* Court directed lower courts to sustain challenges to **all** gun laws that the government does not show are "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

3

The lesson for this case is clear. Instead of treating *Heller*'s "longstanding prohibitions" passage as dispositive, this Court must task the government with providing actual evidence in the historical record showing that felon-disarmament laws, and their applications to individual defendants, are consistent with the Second Amendment.

      b. *The Fourth Circuit's pre-*Bruen *cases upholding § 922(g)(1) do not survive* Bruen*.*

Nor do the Fourth Circuit's post-*Heller* § 922(g)(1) cases survive *Bruen*. Following *Heller*, the Fourth Circuit laid out a two-step, means-ends inquiry for Second Amendment claims in *United States v. Chester*, 628 F.3d 673, 680-83 (4th Cir. 2010). That case involved a challenge to 18 U.S.C. § 922(g)(9), which criminalizes gun possession after conviction for a "misdemeanor crime of domestic violence." *Id.* at 677. Later, in *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012), the Fourth Circuit denied a Second Amendment challenge to § 922(g)(1), relying on *Heller*'s "presumptively lawful regulatory measures" dicta. Finally, in *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012), the Court rejected an as-applied challenge to § 922(g)(1), holding that Mr. Pruess was not a "law abiding responsible citizen," and similar to *Moore*, his conduct was not within the scope of the Second Amendment.

*Moore* noted that *Heller* said that "'nothing in [that] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" which *Heller* characterized as "'presumptively lawful regulatory measures.'" *Id.* at 317-18. The *Moore* court observed that whether felon disarmament laws "could be lawful because they regulate conduct outside the scope of the second amendment" or "because they pass muster under any standard of scrutiny," the presumptive lawfulness of § 922(g)(1) precluded a facial challenge to that statute. *Id.* at 318. Because "the presumption of constitutionality . . . govern[ed]," the court did "not pursue an analysis of the historical scope of the Second Amendment right," as it otherwise would have at

4

*Chester*'s step one. *See Pruess*, 703 F.3d at 246 n.3 (discussing *Moore*). Specifically, *Moore* held *Heller*'s reference to "presumptively lawful" felon-disarmament laws "negates a facial challenge to a felon in possession statute like § 922(g)(1)." *Id.*

As explained above, however, *Bruen* makes clear that uncritical deference to *Heller*'s "presumptively lawful" language is not proper. Instead, courts must subject every type of firearm regulation covered by the Second Amendment—even those on *Heller*'s "presumptively lawful" list—to rigorous scrutiny to determine whether they are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; *see also United States v. Coleman*, --- F. Supp. 3d ----, 2023 WL 6690935 at *3 (E.D. Va. Oct. 12, 2023) (Novak, J.) ("The Fourth Circuit's test does not consult the text of the Second Amendment . . . ."). The "Fourth Circuit's Second Amendment precedent involves a test that (1) employs a categorically different first step from the Supreme Court's test and (2) demands a standard of review that the Supreme Court specifically rejected." *Coleman*, 2023 WL 6690935 at *4.[1]

Thus, the *Chester*-type of Second Amendment analysis is now "obsolete" post-*Bruen*. *Id*. Because *Bruen* implicitly overruled *Chester* and *Moore*, those cases no longer control the Second Amendment analysis. *Bruen* does. 597 U.S. at 17 ("[W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct[.]"); *see also Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019) (observing that prior circuit precedent controls "absent contrary law from an en banc or Supreme Court decision"); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996) ("[I]t is not only the result but also those portions of

---

[1] *United States v. Canada*, 103 F.4th 257 (4th Cir. 2024), cited by Mr. Morton in his Motion to Dismiss, ECF No. 42, also did not review § 922(g)(1) to determine if it is consistent with the Nation's historical tradition of firearm regulation. The Court stated, "[w]e also need not-and thus do not-resolve whether Section 922(g)(1)'s constitutionality turns on…a history and tradition of disarming dangerous people considered as step two of *Bruen*… ." *Canada*, 103 F.4th at 258.

the opinion necessary to that result by which we are bound[.]"). Because the Supreme Court's test in *Bruen* now controls, *Moore* and *Pruess* do not control or resolve Mr. Morton's challenge.

    II.    **The Second Amendment's plain text protects the right of "the people," not only "law-abiding, responsible" people, to keep and bear arms.**

The government continues to argue that "the people" comprises only law-abiding people. *See* ECF No. 49 at 8-13. But, *Rahimi* shunned this approach. First, *Rahimi* rejected the government's argument that the Second Amendment allows Congress to disarm anyone it deems not "responsible" and "law-abiding." In *Rahimi*, the government argued that § 922(g)(8)(C)(i) passed constitutional scrutiny because the Second Amendment "protects only law-abiding, responsible citizens." Gov't Br. 12, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023). In doing so, the government cited several references to the phrase "law-abiding, responsible citizens" in *Heller* and *Bruen*, claiming that the Supreme Court's "precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens." *Id.* at 12.

The Supreme Court rejected that argument. *Rahimi*, 144 S. Ct. at 1903 (citing the portion of the government's brief that argued that the Second Amendment only applies to "law-abiding, responsible citizens."). In doing so, the Court made clear that drawing such broad, amorphous categories was contrary to the Second Amendment analysis. The Court explained that the term "responsible" is a "vague term," and it is "unclear what such a rule would entail." *Id.*

Not only did the Supreme Court reject the government's theory of mass-disarmament for broad and ill-defined categories of people it perceives are not "responsible citizens," the Court also repudiated the premise that *Heller* supported such a theory. The *Rahimi* Court explicitly stated that the government's argument did not "derive from [its] case law." *Rahimi*, 144 S. Ct. at 1903. It noted that *Heller* and *Bruen* used the term "responsible" to "describe the class of ordinary citizens who undoubtedly enjoy the right," but neither decision purported to establish a limit on Second

Amendment protection through that reference. *Id.*; *see also id.* at 1944 (Thomas, J., dissenting) ("The Government's claim that the Court already held the Second Amendment protects only 'law-abiding, responsible citizens' is specious at best.").

True, the Supreme Court in *Rahimi* did not specifically address the "law-abiding" adjective. But both "responsible" and "law-abiding" derive from the same source: *Heller*'s and *Bruen*'s use of those words to describe the challengers in those cases. And just as the "responsible" question "was simply not presented" in *Heller* or *Bruen*, those cases did not address the "law-abiding" question either. *Rahimi*, 144 S. Ct. at 1903.

Indeed, Justice Thomas made that clear in a portion of his dissent:

> The Government, for its part, tries to rewrite the Second Amendment to salvage its case. It argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory. Indeed, the Court disposes of it in half a page—and for good reason. Ante, at 1903. The Government's argument lacks any basis in our precedents and would eviscerate the Second Amendment altogether.
>
> The Government's position is a bald attempt to refashion this Court's doctrine. . . . The Government's claim that the Court already held [in *Heller* and *Bruen*] the Second Amendment protects only 'law-abiding, responsible citizens' is specious at best. . . .
>
> [T]he Government's 'law-abiding, dangerous citizen' test—and indeed any similar, principle-based approach—would hollow out the Second Amendment of any substance.

*Id.* at 1944. Thus, *Rahimi* puts the "law-abiding, responsible citizen" principle to rest once and for all.

Although in one instance toward the end of the *Rahimi* majority opinion, Chief Justice Roberts acknowledged the "presumptively lawful" dicta in *Heller*, that single reference must be understood in the full context:

> Rahimi argues *Heller* requires us to affirm, because Section 922(g)(8) bars individuals subject to restraining orders from possessing guns in the home, and in

7

> *Heller* we invalidated an 'absolute prohibition on handguns . . . in the home.' But *Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'

*Rahimi*, 144 S. Ct. at 1902 (internal citations omitted). The Court was saying only that Mr. Rahimi had misread *Heller*, which on its own terms did not support his position that all firearm bans in the home are unconstitutional. The Court was not independently endorsing the idea that felon-disarmament bans are lawful. Indeed, the *Rahimi* Court thereafter confirmed that, as in *Heller* and *Bruen*, it was "not 'un-dertak[ing] an exhaustive historical analysis . . . of the full scope of the Second Amendment,'" and was "only" holding that people found to pose a credible threat to others may be disarmed. 144 S. Ct. 1903.

Thus, *Rahimi* confirms that the Supreme Court meant what it said when it declared that the Second Amendment right "belongs to all Americans." *Heller*, 554 U.S. at 581. All Americans (including those with a prior felony conviction) are among "the people" protected by the Second Amendment. 18 U.S.C. § 922(g)(1) does not survive step one of *Bruen*.

The government further argues that because American law places some restrictions on the civic rights of felons, § 922(g)(1)'s extinction of a felon's Second Amendment rights is permissible. *See* ECF No. 49 at 10-11. First, the right to keep and bear arms under the Second Amendment is not a "civic right," like the right to vote or hold political office. It is a "fundamental right" grounded in one's "inherent right to self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). Second, of the three "civic rights" the government identifies, only one—the right to vote—is considered "fundamental," in the same class as the right to bear arms. *Compare Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964), *with Carter v. Jury Comm'n of Greene Cnty.*, 396 U.S. 320, 332 (1970). The Fourteenth Amendment, however, recognizes and preserves states'

8

authority to deny individuals the "right to vote . . . for participation in rebellion, *or other crime*." U.S. Const. amend XIV, cl. 2 (emphasis added). It is only because of this language that felons can be deprived of their fundamental right to vote. *See Richardson v. Ramirez*, 418 U.S. 24, 54 (1974).[2]

Further, a holding that felons are not part of "the people" because they are part of "the political community" cannot be reconciled with the Supreme Court's decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) ("'[T]he people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."). *Heller* itself adopted this very passage of *Verdugo-Urquidez*, and after so doing, observed, "[w]e start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 580-81.

Adhering to the canon of consistent meaning "assum[ing] that terms retain the same meaning each time that they are used." *Coleman*, 2023 WL 6690935, at *10 (citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). If the government's theory "that the Second Amendment's coverage turns on felony status—were correct, then the scope of the Constitution's text would have implicitly changed over the course of centuries, covering different persons depending on whether the legislature of that era criminalized their conduct." *Coleman*, 2023 WL 6690935, at *11. "Adopting [the government's] theory would contravene the *Heller* Court's admonition to reject interpretations of the Second Amendment that vacillate over time depending on legislative whim." *Id.*

---

[2] Moreover, in nearly all states, the right of felons to vote is only temporarily infringed.

Mr. Morton, who is an American citizen, is part of the United States' "national community." *Heller*, 554 U.S. at 580. He is therefore among "the people" protected by the Second Amendment, which presumptively protects his right to keep and bear arms.

### III. The government has not shown that § 922(g)(1) is consistent with the United States' historical tradition of firearm regulation.

To rebut the presumption of § 922(g)(1)'s unconstitutionality, the government must demonstrate that a challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Section 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142; *see also* Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009) ("[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century."); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?,* 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; *see also* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund,

*The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) (similar).

There was no "historical tradition," circa 1791, of gun regulations sufficiently similar to § 922(g)(1). *Bruen*, 597 U.S. at 24-26. The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by felons' access to guns. *Id.* at 27. Because they declined to do so, § 922(g)(1) both facially and as applied to Mr. Morton "[i]s unconstitutional." *Id.*

## IV. The Court should reject the government's efforts to define the relevant historical tradition at a high level of generality.

The government has argued § 922(g)(1) is constitutional because it fits within a supposed historical tradition permitting legislatures to take firearms away from "irresponsible" people or people who have disturbed the peace. The government seeks to support this argument by citing pre-founding-era laws, minority views in state constitutional conventions, purported pre-cursors to the Second Amendment, and antebellum laws. *See* ECF No. 49 at 15-23. Based on these disparate regulations, the government deduces a broader principle: that the Second Amendment, as it was understood in 1791, did not protect members of any group whom a legislature might rationally deem "irresponsible" or to have disturbed the peace even if that specific group (such as felons) was never disarmed at the founding. But this argument operates at too high a level of generality. *Bruen* demonstrates that in carving out exceptions to "the Second Amendment's unqualified command," 597 U.S. at 17, courts should proceed cautiously, defining those exceptions to ensure their consistency with America's historical tradition of firearm regulation.

Turning to the first set of laws that the government argues here are sufficiently analogous to § 922(g)(1)—laws the English enacted in the American colonies prior to the Revolutionary War,

11

*see* ECF No. 49 at 15-17, those purported precedents do not comprise ***this*** country's history and tradition of gun regulation. The pre-founding laws the government cites paint a picture of the English government's desire to disarm swaths of Americans for conduct that the English found objectionable. It was this sort of widespread disarmament that fomented the first salvo in the Revolutionary War itself. The Battles of Lexington and Concord on April 19, 1775, were in direct response to English efforts to "seize and destroy arms and supplies and disrupt the colonists' warlike preparations." *See* National Park Service, *April 19, 1775* (Sept. 29, 2022), *available at* https://www.nps.gov/mima/learn/historyculture/april-19-1775.htm. What the colonies did in response was to declare independence from England, enshrine their rights to keep and bear arms against the English in declarations of rights, and ultimately, pass the Second Amendment to the Constitution, which protected the right of "the people"—all Americans—to keep and bear arms. Thus, the government's pre-founding laws are not sufficiently similar to § 922(g)(1). *See Bruen*, 597 U.S. at 34 ("Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.").

The government next points to a minority view in the Pennsylvania state convention that suggested that people could be disarmed for prior criminal convictions. *See* ECF No. 49 at 18-20. What the Pennsylvania state convention passed in 1776 said absolutely nothing about prior criminal convictions in relation to bearing arms. Rather, section thirteen of Pennsylvania's declaration of rights guaranteed simply that "the people have a right to bear arms for the defence of themselves and the state." Massachusetts made a similar declaration in 1780: "The people have a right to keep and to bear arms for the common defence." New York declared in relation to arms: "it is the duty of every man who enjoys the protection of society to be prepared to defend it." North Carolina proclaimed: "That the people have a right to bear arms, for the defence of the State." And

ultimately what became the supreme law of this country was the Second Amendment, which protects from infringement, "the right of the people to keep and bear arms." U.S. Const. amend. 2. A minority view that was soundly rejected does not a sufficiently similar regulation make.

Next, the government points to antebellum and post-antebellum ***commentators*** (not laws). *See* ECF No. 49 at 20-23. *Bruen* dispenses with such authority: "As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" 597 U.S. at 36.

Finally, lacking any sufficiently similar law at or near the time of the founding, the government returns to its reliance on the unconstitutionally vague phrase "law-abiding, responsible citizens." ECF No. 49 at 23-28. As evidence, the government points to laws disarming citizens during or immediately after the Revolutionary War who refused to swear an oath of allegiance to their respective states. *Rahimi* quickly dispensed with such comparisons, observing: "By the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic." 144 S. Ct. at 1899.

In applying *Bruen*, *Rahimi* made clear that Second Amendment challenges mandate detailed historical analysis applied to a specific law, not sweeping generalities, as the government has attempted to do in defense of § 922(g)(1). With respect to § 922(g)(8)(C)(i), the *Rahimi* Court ultimately concluded that surety laws and "going armed" laws sufficiently established a tradition of temporarily disarming someone found by a court to pose a credible threat to the physical safety of others (like § 922(g)(8)(C)(i) does today). Notably, surety laws—like § 922(g)(8)(C)(i)—

13

mitigated "demonstrated threats of physical violence" and were temporary. *Rahimi*, 144 S. Ct. at 1901.

In stark contrast, § 922(g)(1) contains no requirement that a judge find that someone poses a threat, and the statute permanently disarms people on the basis of a prior conviction alone. Additionally, like domestic violence restraining orders today, the surety regime was "individualized," *id.* at 1899, while § 922(g)(1) is categorical. So-called "going armed" laws—again, like § 922(g)(8)(C)(i)—were similarly limited in scope, disarming people based on individualized determinations that they threatened public safety rather than overly broad categorical bans. *Id.* at 1902. Moreover, a person subject to a surety bond received "significant procedural protections" and "could obtain an exception if he needed his arms for self-defense." *Id.* at 1900. "Many postfounding going armed laws" incorporated similar exceptions. *See id*. at 1942 (Thomas, J., dissenting). Not so for someone disarmed under § 922(g)(1). *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) (explaining that the provision for restoring firearm rights, 18 U.S.C.§ 925(c), has been "rendered inoperative" by lack of funding). Thus, in *Rahimi*, the government pointed to highly specific founding-era regulations that justified the narrowly tailored and temporary firearm restriction found in § 922(g)(8)(C)(i).

Failing to meet that burden, the government here still has not identified a single historical firearm law that imposed anything close to § 922(g)(1)'s broad Second Amendment divestment, i.e., a categorical, life-long prohibition for every American ever convicted of any offense punishable by more than one year of imprisonment. The vague references to prohibiting those unwilling to obey laws and viewed as dangerous are insufficient. As a threshold matter, the primary purpose behind such statutes was political. But even if they also promoted public safety, that can be said of any firearm regulation—including the one struck down in *Bruen*. And as discussed

14

above, the Supreme Court squarely rejected similarly-broad, generalized "dangerousness" arguments under the guise of "responsibility" in *Rahimi*.

Moreover, as Justice Barrett rightly pointed out, interpreting historical principles "at such a high level of generality . . . waters down the right." *Id.* at 1926 (Barrett, J., concurring, citing the majority decision, *id.* at 1896).

In finding surety statutes to be sufficiently similar in *Rahimi*, the Court emphasized "importantly for this case," those laws "targeted the misuse of firearms." *Id.* at 1900 (emphasis added). And that was also true for the "going-armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id.* at 1900-01. In other words, both early legal regimes criminalized specific—and serious—misconduct with a gun. Section 922(g)(1), by contrast, bans a category of people from possessing firearms whether or not they have "terrif[ied] the good people of the land," 144 S. Ct. at 1901, or in fact, whether they have ever used or misused a gun. Therefore, laws that did not specifically target the misuse of firearms or gun violence, are not "comparably justified" analogues for § 922(g)(1).

Notably, the government's argument fails to meaningfully address the "how" question— specifically, the lifetime disarmament § 922(g)(1) proscribes. In the "how" analysis in *Rahimi*, the Court highlighted specific features of § 922(g)(8)(C)(i) that strictly limited its scope and its ban's duration which rendered § 922(g)(8)(C)(i) constitutional. As the Court observed, § 922(g)(8)(C)(i) restricts gun possession only if a restraining order "includes a finding that [a] person represents a credible threat to the physical safety of [an] intimate partner or child." In other words, the statute "restricts gun use to mitigate demonstrated threats of physical violence" and applies only once a court has made an individualized finding that such a threat exists. *Rahimi*, 144 S. Ct. at 1901. By contrast, § 922(g)(1) is a categorical ban that prohibits everyone convicted of a crime punishable

15

by more than a year in prison from possessing a gun—without any individualized finding. And, critically, *Rahimi* also emphasized that § 922(g)(8)'s restriction is "temporary." *Id.*

In short, the Supreme Court confirmed in Rahimi that both the "how" and the "why" of historical laws must be sufficiently similar to the modern regulation to provide any support for a history and tradition of such regulation. The government's argument fails to meet its burden. Thus, for the same reasons § 922(g)(8) is constitutional, § 922(g)(1) clearly is not.

## CONCLUSION

Mr. Morton is part of "the people" who are protected by the Second Amendment. Thus, his conduct here is presumptively unconstitutional. The government has not provided sufficient historical evidence to overcome that presumption of unconstitutionality. Thus, 18 U.S.C. § 922(g)(1) is unconstitutional both facially and as applied to Mr. Morton. The Court must dismiss Counts Two and Thirteen of the Indictment.

Respectfully submitted,
WILLIAM THOMAS MORTON, JR.

By: _____/s/_____
Joseph S. Camden
Assistant Federal Public Defender
Va. Bar #92143
Attorney for William Thomas Morton, Jr.
Office of the Federal Public Defender
Eastern District of Virginia
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0830 (direct)
(804) 800-4214 (fax)
Joseph_Camden@fd.org